78 P.3d 317

STATE of Hawai'i, Plaintiff–Appellee,

v.

Kenneth WAKISAKA, Defendant–Appellant.

No. 25348.

Supreme Court of Hawai'i.

Oct. 23, 2003.

John S. Edmunds and Ronald J. Verga, on the briefs, Honolulu, for Defendant–Appellant, Kenneth Wakisaka.

Loren J. Thomas, Deputy Prosecuting Attorney, on the briefs, for Plaintiff–Appellee, State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ. .

Opinion of the Court by DUFFY, J.

Defendant-appellant Kenneth Wakisaka (Kenneth) appeals from the judgment of conviction and sentence of the Circuit Court of the First Circuit, adjudging him guilty of second degree murder of his wife Shirlene Wakisaka (Shirlene) in violation of Hawai'i Revised Statutes (HRS) §§ 707–701.5[1] and 706–656.[2] Kenneth claims that he was denied his rights to due process and effective assistance of counsel; he also claims that the circuit court committed a number of errors in its evidentiary rulings. Specifically, Kenneth alleges that (1) the prosecution improperly commented on Kenneth's decision not to testify; (2) Kenneth received ineffective assistance of counsel[3]; (3) the circuit court erred in prohibiting Shirlene's physician from testifying as to Shirlene's anxiety disorder; (4) the circuit court erred in restricting Kenneth's cross-examination of witnesses; and (5) the circuit court erred in allowing the prosecution to introduce inadmissible hearsay evidence. We agree with Kenneth on points one and two; we therefore vacate the judgment of conviction and sentence and remand to the circuit court for a new trial. Although our rulings on points one and two are dispositive of this case, we also briefly address point three in order to provide some guidance to the circuit court on retrial.

## I. BACKGROUND

### A. Factual Background

#### 1. Testimony by police, fire, ambulance, hospital, .and other medical personnel

On April 5, 2000, at approximately 6:20 a.m., three fire fighters from the Honolulu Fire Department (HFD) were sent to the Wakisakas' residence.[4] When HFD personnel arrived, Kenneth asked for help: he informed the fire fighters that Shirlene had taken sleeping pills and had consumed beer. HFD Captain Paul Kohara (Captain Kohara)

---

1. HRS § 707–701.5 (1993) provides:

 **§ 707–701.5. Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

 (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

2. HRS § 706–656 (1993 & Supp.2002) provides:

 **§ 706–656 Terms of imprisonment for first and second degree murder and attempted first and second degree murder.** (1) Persons convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment without possibility of parole.

 As part of such sentence the court shall order the director of public safety and the Hawaii paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

 (2) Except as provided in section 706–657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree

murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawaii paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

If the court imposes a sentence of life imprisonment without possibility of parole pursuant to section 706–657, as part of that sentence, the court shall order the director of public safety and the Hawaii paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

3. Kenneth's counsel on appeal was not counsel at trial.

4. The fire fighters were sent to the Wakisakas' residence after Shirlene's daughter Tammy Cocard (Tammy), who was in California at the time, called the Honolulu Police Department (HPD) and requested an ambulance be sent. The circumstances surrounding this telephone call are discussed more fully *infra*.

testified that Shirlene appeared physically normal, but that "she was in an emotional state where she didn't seem to acknowledge that we wanted to help her." Captain Kohara testified that there was no odor of alcohol on Shirlene's breath and that Shirlene was somewhat distraught but otherwise normal. He also testified that Kenneth was in "an excitable state." Captain Kohara did not notice any visible injuries to Shirlene. He testified that he had no reservations about leaving Shirlene at her home, as there was no indication that Shirlene was under the influence of drugs or alcohol.

HFD and paramedics from the City and County of Honolulu returned to the Wakisakas' residence that same afternoon in response to a second emergency call. Kenneth spoke with Emergency Medical Technician (EMT) Nathan Fishman (EMT Fishman); he informed EMT Fishman that, at approximately 2:10 p.m., Shirlene appeared to be choking and collapsed. EMT Fishman testified that Shirlene's color was "very poor" and that she "had some redness around her neck area" on both sides of her neck. He described Kenneth as "anxious."

HFD Fire Fighter Mark Adams (Fire Fighter Adams) testified that Shirlene's neck was "reddish colored and mottled." He testified that Shirlene's body color was blue around her lips and that ambulance personnel performed CPR. He explained that blue color around the lips is a symptom of being hypoxic (having an inadequate amount of oxygen), but that blue color is also a symptom of myocardial infarction (i.e., heart attack). He also testified that aspiration of vomitus could cause a person to become hypoxic. Fire Fighter Adams described Kenneth as "very nervous."

Following Shirlene's examination at the Wakisakas' residence, she was taken to St. Francis Medical Center West (St.Francis); she died on April 10, 2000 after being removed from life support.

HPD Detective Wayne Cambra (Detective Cambra) was assigned to investigate a possible suicide attempt involving Shirlene. On April 6, 2000, Detective Cambra returned to the Wakisakas' residence and looked for evidence of attempted suicide. Kenneth was home at the time and directed Detective Cambra to the medicine cabinet; inside the cabinet was a white bottle, containing small red tablets, labeled quinine sulfate. Detective Cambra did not recover the bottle on that day. On April 8, another HPD Detective notified Detective Cambra that they had recovered evidence in the case: Tiffany Irvin–Young (Tiffany) and Tammy, Shirlene's daughters from a previous marriage, reported that they found two pill bottles, including the quinine sulfate bottle, in the Wakisakas' backyard. Detective Cambra testified that he had thoroughly searched that portion of the backyard on April 6, and that the bottles were not in the backyard on April 6. Detective Cambra was certain that the quinine sulfate bottle he received on April 8 was the same bottle he saw on April 6 due to the labels on the bottle. He also testified that, on April 8, the quinine sulfate bottle did not have any pills inside.

The evening of April 10, the chief investigator for the City and County of Honolulu Department of the Medical Examiner, Susan Siu, informed Kenneth that an autopsy would be performed on Shirlene. Upon hearing this, Kenneth became irate, insisting that Shirlene died a natural death. Kenneth then asked whether an autopsy would indicate that Shirlene had been strangled; Siu was "shocked" at this question because, at that point, Siu had no information that this might be a strangulation case.

An autopsy was performed on April 11, 2002. Kenneth telephoned Siu after the autopsy had been completed and asked her whether the autopsy showed that Shirlene had been strangled. Siu told Kenneth that they had not yet determined the cause of death because the medical examiner's office had to wait for test results from the mainland. Kenneth then became irate and wanted to know the cause of Shirlene's death immediately. Siu stated that Kenneth called her on a daily basis and that, during these calls, Kenneth would get angry that the medical examiner's office had not yet determined the cause of death. Siu testified that at one point Kenneth claimed to have a death certificate indicating the cause of death to be natural. She testified that Kenneth could

not have had a death certificate because death certificates are issued by the medical examiner's office and her office had not yet issued a death certificate for Shirlene.

Deputy Medical Examiner Bani Win, M.D., performed the autopsy on Shirlene. Dr. Win concluded, to a reasonable degree of medical certainty, that Shirlene died as a result of "ligature strangulation." Dr. Win testified that she found a diagonal bruise on the right side of Shirlene's neck, just below the jaw line. Dr. Win categorized the bruising as a ligature mark; a ligature is "any kind of narrow rope or scarf or anything that's narrow that you can put around a neck." She testified that Shirlene's neck tissue was actually bruised, and that the marks on her neck were not just skin discolorations. Dr. Win also testified that she found spotty hemorrhaging in Shirlene's right eye, suggesting that there had been pressure on the blood vessels of Shirlene's head and neck.

On cross-examination and recross-examination, Dr. Win testified that Shirlene had several tubes in her nose and mouth while hospitalized between April 5 and April 10 and that those tubes were resting against the right side of Shirlene's throat for five days. She also acknowledged that the reports of the emergency room physicians at St. Francis indicated that, when Shirlene was admitted to the emergency room, Shirlene's neck was not bruised. However, Dr. Win also testified that there was no indication that the bruising on Shirlene's neck was caused by the tubes.

Dr. Win's examination showed that Shirlene did not die as a result of a heart attack. Dr. Win also tested Shirlene's blood for drugs,[5] which tests revealed that Shirlene had quinidine—a drug used to treat irregular heartbeats—in her blood. A mainland laboratory confirmed that the drug was quinidine, and that the level of quinidine in Shirlene's blood was eleven milligrams per liter. Eleven milligrams per liter is not a lethal dose of quinidine.[6] Shirlene also had .26

milligrams per liter of pseudoephedrine in her blood.

John Hardman, M.D., assisted Dr. Win with her analysis and testified for the prosecution as an expert witness in the field of neuropathology. Dr. Hardman testified that Shirlene suffered brain death resulting from inadequate blood and oxygen supply to her brain. He testified that strangulation could have caused Shirlene's brain to receive inadequate oxygen, and that neither aneurysm nor stroke could have caused Shirlene's brain death. On cross-examination, Dr. Hardman stated that he could not rule out the possibility that Shirlene died as a result of a heart attack.

Anthony Manoukian, M.D., a board-certified forensic pathologist called by defense counsel, testified that he did not believe that strangulation was the cause of Shirlene's death. He testified that the bruise on Shirlene's neck was atypical of ligature strangulation. Generally, in ligature strangulation cases, there is a front-to-back abrasion on the neck below the Adam's apple. In Shirlene's case, however, the ligature abrasion was above the Adam's apple and was angled (*i.e.*, the abrasion was front-to-back and bottom-to-top). Dr. Manoukian further testified that the autopsy report showed a small defect in Shirlene's heart, characterized by scarring in an abnormal structure in her heart muscle; this defect, combined with the drugs in her system, could have caused a heart attack with resulting lack of oxygen to the brain. Ultimately, Dr. Manoukian would not have classified the cause of Shirlene's death as ligature strangulation, but instead would have classified it as "undetermined."

### 2. Testimony by Shirlene's daughters

Tammy and Tiffany testified at Kenneth's trial. Tammy testified that her mother had a history of psychiatric problems and that she and Tiffany encouraged Shirlene to seek help for these problems.

---

**5.** For the tests, Dr. Win used a sample of Shirlene's blood that was taken upon Shirlene's admission to the hospital on April 5, 2000.

**6.** Eleven milligrams per liter could be a lethal dose of quinine, a closely related drug used to treat malaria. However, the mainland laboratory confirmed that the drug found in Shirlene's blood was quinidine, rather than quinine.

Tammy testified that, between 5:00 a.m. and 5:30 a.m. Hawai'i time on April 5, Shirlene and Tammy (who was in California at the time) spoke over the telephone and Shirlene told Tammy that she (Shirlene) had taken some pills. Tammy testified that Shirlene's speech was unusual: Shirlene's words "were slurred and spaced" and there were "[l]ong periods of time between each word." Shirlene told Tammy that she was dying. Tammy called Tiffany, then called the police in Hawai'i and asked that they send an ambulance to her mother's address.

Just before 10:00 a.m. Hawai'i time, Tiffany called the Wakisakas' residence. Kenneth informed Tiffany that everything was fine and that Shirlene had not been taken to the hospital. Tiffany then spoke to Shirlene; Tiffany described Shirlene's speech as "drawn out and slurred, and it was like something I've never heard before." Tiffany called Tammy to inform her that the ambulance had not taken Shirlene to the hospital. Tammy then called Kenneth and asked him why Shirlene had not been taken in the ambulance; Tammy testified that Kenneth stated that Shirlene was drunk and needed to sleep it off, and that he and Shirlene could work out their own problems and did not need help. Tammy also testified that Kenneth stated that Shirlene was "sleeping like a dog."

Several hours later, Kenneth called Tammy and informed her that Shirlene was in the emergency room on life support. Tammy testified that Kenneth told her that Shirlene had "just stopped breathing." Tammy spoke with Kenneth several times; she testified that each time he told the story of the events of the morning of April 5, the facts changed slightly and the stories did not make sense.

Tammy spoke with Detective Cambra and informed him that she would like to record a telephone conversation between her and Kenneth. On the morning of April 7, 2000, Tammy called Kenneth; the two spoke for approximately one hour, and the conversation was recorded. The prosecution played the recording of this conversation for the jury. During that conversation, Kenneth told Tammy that, on the morning of April 5,

Shirlene told him she had taken quinine pills; Kenneth told Tammy that he was unable to find any pill bottles anywhere. Kenneth told Tammy that, around 11:00 a.m. the morning of April 5, Shirlene said something to the effect of, "it's not working, it's not working." The conversation continued as follows:

MR. WAKISAKA:—I guess I don't wanna say it. But she did say—you know, she said to choke—you know, choke me. She said choke—she said, choke me so I could die.

MS. COCARD: She said that?

MR. WAKISAKA: Yeah. She said please choke me.

MS. COCARD: Oh, Ken, didn't you think that at that point you should call the ambulance?

MR. WAKISAKA: No, 'cause I thought she was just being delusional.

Tammy testified that Kenneth spoke at Shirlene's funeral, where he gave a step-by-step account of how Shirlene died. Upon hearing his remarks, Tammy felt "[s]ick ... [b]ecause it was so incredibly inappropriate."

Tiffany testified that, around January 2000, Shirlene told her that Kenneth threatened to blow up Tiffany's and Tammy's houses. She also testified that in February 2000, Shirlene made Tiffany promise that she (Tiffany) would investigate if anything were to happen to Shirlene. Tiffany testified that when she spoke with her mother in March of 2000, Shirlene was very upset because she had just discovered that Kenneth had taken out a life insurance policy on her life. As a result, Shirlene was concerned for her safety.

Tammy testified that Shirlene had instructed Tammy to look for her (Tammy's) baby pictures if anything were to happen to Shirlene. On April 8, Tammy and Tiffany went to the Wakisakas' residence to get the baby pictures. Kenneth had given Tammy and Tiffany permission to go to the house to get the pictures, and Kenneth had set the pictures out for them. Tammy testified that she found a sealed manila envelope labeled as containing Tammy's and Tiffany's baby pictures. Inside the envelope were papers on education for spousal abuse, including Shirlene's handwritten notes, and a notebook

with Wakisaka's notes. Tammy and Tiffany also recovered a number of letters and other documents from Shirlene's townhouse in San Leandro, California, which letters indicated domestic violence between Kenneth and Shirlene. Tiffany testified that none of these letters indicated that Shirlene was going to commit suicide.

B. *Procedural Background: Trial History*

On March 28, 2001, Kenneth was indicted for murder in the second degree in violation of HRS §§ 707–701.5 and 706–656. At trial, the prosecution argued that the medical evidence showed that Shirlene died from strangulation, not a drug overdose or a heart attack. Defense counsel argued that Shirlene had psychiatric problems and committed suicide.

### 1. Elicitation of opinion testimony

During trial, the prosecution called Detective Cambra to testify regarding his investigation of Shirlene's death. During cross-examination, defense counsel specifically elicited Detective Cambra's opinion that Kenneth had murdered Shirlene; defense counsel also asked Detective Cambra to outline the evidence he had to substantiate that opinion. Defense counsel's questioning of Detective Cambra proceeded as follows:

Q [BY DEFENSE COUNSEL]. Okay. Do you have any forensic evidence, as lead detective in this case, directly linking the defendant, Mr. Wakisaka, to the death of his wife?

[THE PROSECUTION]: Your Honor, I'm going to object.

THE COURT: Sustained. Next question.

BY [DEFENSE COUNSEL]:

Q. Do you have any hard evidence linking Mr. Wakisaka to the death of his wife?

**7.** At this point, Detective Cambra actually said, "Statements made at the trial and evidence recovered from the residence." On redirect, however, the prosecution asked Detective Cambra about this question:

BY [THE PROSECUTION]:
Q. Sergeant Cambra, just so we're clear. When you were asked the question by defense

[THE PROSECUTION]: Same objection.

THE COURT: Sustained.

BY [DEFENSE COUNSEL]:

Q. Do you have any evidence, other than the opinion of Dr. Win?

THE COURT: I'm going to sustain that as well without the State standing to object.

[DEFENSE COUNSEL]: All right.

THE COURT: The jury will determine the case, not this Detective, Sergeant.

BY [DEFENSE COUNSEL]:

Q. What evidence do you have that indicates that Mr. Wakisaka had anything to do with his wife's death?

THE COURT: Do you really want this person to give his opinion?

[DEFENSE COUNSEL]: Why not.

THE COURT: Come around this way.

(Bench conference.)

THE COURT: Do you think he killed her?

THE WITNESS: Yes, I do.

THE COURT: All right. You may give your opinion. Thank you.

(Bench conference concluded.)

THE COURT: On invitation of the defense counsel, you may answer the question.

BY [DEFENSE COUNSEL]:

Q. You have an opinion, yes?

A. Yes, I do.

Q. What is that opinion based upon?

A. Statements made [by Kenneth to me during interviews of him [7]] and evidence recovered from the residence and in conjunction with this investigation.

Q. Okay. And that's it?

A. Yes.

counsel about what you based your opinion of the defendant's being involved in the murder of his wife, you spoke about statements the defendant made in trial?
A. Right. I—I caught myself later. It should have been statements the defendant made to me during the interviews of him, I'm sorry.

Q. *What is your opinion?*

A. *My opinion is that Mr. Wakisaka did, in fact, murder Mrs. Wakisaka.*

Q. *How?*

A. *Through strangulation.*

Q. *What specific evidence do you have to substantiate that conclusion, that opinion?*

THE COURT: It's been asked. You can respond.

A. (By the witness) Basically that his statement to me was that he stayed home from work with her all day because he felt that she was not—she was not feeling well, so he stayed home from work to take care of her.

And in between the time the first ambulance was called at 6:00 in the morning and the time the second ambulance was called at 2:15, her condition worsened, and she was in a coma actually when the second ambulance did take her away. His denial of treatment by the first ambulance, there's just so much in there.

Q. Okay. Did you investigate this matter with the ambulance personnel.

A. Yes, I did.

Q. Did the ambulance personnel inform you—

THE COURT: Counsel, at this time the Court's going to limit questioning, so we can allow the jury to draw their own conclusions, all right.

BY [DEFENSE COUNSEL]:

Q. We have the testimony of the ambulance personnel. You did interview with them?

A. Yes.

THE COURT: Counsel, I have terminated your line of questioning. Proceed. The jury will discuss the evidence.

(Emphasis added.) The following day, the court questioned defense counsel regarding his strategy for eliciting Detective Cambra's opinion; defense counsel and Kenneth confirmed the court's assumption that this questioning was designed to show that Detective Cambra was working with Shirlene's daughters to collect evidence, and that Detective Cambra was therefore biased against Kenneth. The prosecution then asked the court to strike Detective Cambra's testimony regarding his opinion that Kenneth murdered Shirlene, arguing that Detective Cambra's opinion was irrelevant and that the jury—rather than the witness—should decide whether Kenneth murdered Shirlene. The court stated that it would strike Detective Cambra's testimony at defense counsel's request, but would not do so at the prosecution's request. Despite this prompting by the court, Kenneth's counsel did not make a request to strike the damaging testimony.

### 2. Direct examination of Shirlene's physician

Kenneth called Sharon Lawler, M.D., as a witness. Dr. Lawler was board-certified in internal medicine and had a general practice; she treated Shirlene from 1996 to 1999 for coughs, colds, and injuries, and treated Shirlene in the latter part of 1999 for anxieties. When defense counsel sought to question Dr. Lawler about the causes of Shirlene's anxieties, the prosecution objected on hearsay grounds; the prosecution argued that because Dr. Lawler specialized in internal medicine and was neither a psychiatrist nor psychologist, Shirlene's statements to Dr. Lawler regarding her anxieties were not made as statements of medical treatment under Hawai'i Rules of Evidence (HRE) Rule 803(b)(4).[8] Defense counsel made an offer of proof that Dr. Lawler had been treating Shirlene for a general anxiety disorder as a result of certain matters that had

---

8. HRE Rule 803 (1993) provides in relevant part:
**HEARSAY EXCEPTIONS; AVAILABILITY OF DECLARANT IMMATERIAL**
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
. . .
**(b) Other Exceptions**
. . .

(4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

occurred in her life; defense counsel also represented that Dr. Lawler would testify that Shirlene was agoraphobic and would not leave her home to come to Dr. Lawler's office, such that Dr. Lawler had to go to Shirlene's home to treat her. When the circuit court inquired as to the relevance of this testimony, defense counsel argued that the testimony would be consistent with the defense theory of drug overdose and suicide. The court sustained the prosecution's objection and refused to permit Dr. Lawler to testify about Shirlene's anxieties. While the court did allow Dr. Lawler to testify that she referred Shirlene for psychiatric treatment, the court did not allow her to testify as to her reasons for making such a referral. Defense counsel made an offer of proof that Dr. Lawler would testify that Shirlene was a mentally ill person who needed help. The court further prevented Dr. Lawler from testifying: (1) that she suggested that Shirlene admit herself to Kahi Mohala, a psychiatric hospital; (2) as to which medications she prescribed for Shirlene and the reasons for prescribing those medications; (3) that Shirlene did not express any fear of Kenneth to her; (4) that Shirlene exhibited signs and symptoms of agoraphobia and hyper-vigilance; and (5) that Shirlene had asked her to write a letter stating that Shirlene presented signs and symptoms of acute anxiety disorder.[9]

### 3. Prosecution's comments on defendant's failure to testify

Kenneth did not testify in his own defense. During rebuttal argument, the prosecution stated: "Who was alone with her? He was alone with her. He was there. He would know. If he doesn't tell us, we can only look to Shirlene and see what her body tells us." Kenneth's counsel did not object to these statements, and the court did not *sua sponte* give a curative instruction.

### 4. Conviction

On June 28, 2002, a jury convicted Kenneth of second degree murder. The court sentenced him to an indeterminate maximum

term of imprisonment for life with the possibility of parole and ordered him to pay restitution of $480 to Tiffany Irvin, $43,473.95 to Shirlene's estate, and a $100 crime victim compensation fee. Kenneth filed a notice of appeal on September 23, 2002.

## II. STANDARDS OF REVIEW

### A. Prosecutorial Misconduct

 If defense counsel does not object at trial to prosecutorial misconduct, this court may nevertheless recognize such misconduct if plainly erroneous. "We may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Cordeiro*, 99 Hawai'i 390, 405, 56 P.3d 692, 707 (2002) (citations and internal quotation marks omitted). *See also* Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (2003) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). We will not overturn a defendant's conviction on the basis of plainly erroneous prosecutorial misconduct, however, unless "there is a reasonable possibility that the misconduct complained of might have contributed to the conviction." *State v. Rogan*, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999). As we stated in *State v. Sawyer*:

> Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of "whether there is a reasonable possibility that the error complained of might have contributed to the conviction." Factors considered are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.

88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998) (quoting *State v. Balisbisana*, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996)) (citations omitted).

### B. Ineffective Assistance of Counsel

 When reviewing a claim of ineffective assistance of counsel, this court looks at

---

9. Shirlene wanted this letter so that she would be excused from appearing in court in response to a bench warrant charging her with terroristic threatening.

whether defense counsel's assistance was "within the range of competence demanded of attorneys in criminal cases." *State v. Antone*, 62 Haw. 346, 348, 615 P.2d 101, 104 (1980) (citations and internal quotation marks omitted). "The defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." [10] *State v. Aplaca*, 74 Haw. 54, 66–67, 837 P.2d 1298, 1305 (1992). To satisfy this second prong, the defendant needs to show a possible impairment, rather than a probable impairment, of a potentially meritorious defense. *State v. Christian*, 88 Hawai'i 407, 419, 967 P.2d 239, 251 (1998). A defendant need not prove actual prejudice. *Id.*

## C. *Admissibility of evidence*

[D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

10. This standard differs from the standard for finding ineffective assistance of counsel under the sixth amendment to the United States Constitution: "Because the [test in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)] has been criticized as being unduly difficult for a defendant to meet, we continue to follow the standard first enunciated in *Antone* because under Hawaii's Constitution, defendants are clearly afforded greater protection of their right to effective assistance of counsel." *State v. Aplaca*, 74 Haw. 54, 67, 837 P.2d 1298, 1305 (1992).

11. HRE Rule 401 (1993) provides:
**DEFINITION OF "RELEVANT EVIDENCE"**
"Relevant evidence" means evidence having any tendency to make the existence of any fact

*Kealoha v. County of Hawai'i*, 74 Haw. 308, 319–20, 844 P.2d 670, 676 (1993).

### 1. Relevance and probative value

A trial court's determination of relevance pursuant to Hawai'i Rules of Evidence (HRE) Rule 401 (1993) [11] can produce only one correct result, and is therefore reviewable under the right/wrong standard. *Kealoha*, 74 Haw. at 314–15, 844 P.2d at 674. However, "the determination of the admissibility of relevant evidence under HRE 403 [12] is eminently suited to the trial court's exercise of its discretion because it requires a 'cost-benefit calculus' and a 'delicate balance between probative value and prejudicial effect[.]'" *Kealoha*, 74 Haw. at 315, 844 P.2d at 674 (citations omitted) (second alteration in original).

### 2. Hearsay

"We review the admissibility of evidence pursuant to HRE Rule 803 under the right/wrong standard, because '[t]he requirements of the rules dealing with hearsay are such that application of the particular rules can yield only one correct result.' *State v. Moore*, 82 Hawai'i 202, 217, 921 P.2d 122, 137 (1996)." *State v. Yamada*, 99 Hawai'i 542, 550, 57 P.3d 467, 475 (2002) (alteration in original).

## III. *DISCUSSION*

### A. *Prosecutorial Misconduct*

As a rule, the prosecution may not comment on a defendant's failure to testify. *See, e.g., Chavez v. Martinez*, 538 U.S. 760, ——,

that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

12. HRE Rule 403 (1993) provides:

**EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION, OR WASTE OF TIME**
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

123 S.Ct. 1994, 2002, 155 L.Ed.2d 984, 994–95 (2003) ("[N]o 'penalty' may ever be imposed on someone who exercises his core Fifth Amendment right not to be a 'witness' against himself in a 'criminal case.' ") (citing *Griffin v. California*, 380 U.S. 609, 614–15, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106, 109–110 (1965) ("We ... hold that the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.")). The rule prohibiting the prosecution from commenting on a defendant's failure to testify is a bedrock principle of the Hawai'i Constitution: article I, section 10 provides that "[n]o person shall ... be compelled in any criminal case to be a witness against oneself." *See Kaneshiro v. Belisario*, 51 Haw. 649, 651–52, 466 P.2d 452, 454 (1970) ("[I]t is clear that United States Supreme Court decisions and Hawaii law prohibit prosecutorial comment on the accused's assertion of the right [against self-incrimination] in a criminal proceeding ..." (citing *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)).).

▮▮▮▮ Even if the prosecution violates this rule, however, we will not overturn a defendant's conviction if the prosecution's misconduct is harmless beyond a reasonable doubt. As we explained in *State v. Clark*:

"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff*, 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994) (citations omitted). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." *State v. Agrabante*, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992) (citation omitted).

83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996). *See also State v. Klinge*, 92 Hawai'i 577, 584, 994 P.2d 509, 516 (2000) (applying the three-part test to determine whether the alleged prosecutorial misconduct was reversibly erroneous).

▮▮▮▮ Applying the three-part test for prosecutorial misconduct to this case, we hold that the prosecution's misconduct in this case was not harmless beyond a reasonable doubt.

### 1. Nature of alleged misconduct

▮▮▮▮ As a rule, the prosecution cannot comment on the defendant's failure to testify because this infringes on the defendant's right not to be a witness against her- or himself. Haw. Const. art. I, § 10. *See Tachibana v. State*, 79 Hawai'i 226, 235, 900 P.2d 1293, 1302 (1995) (recognizing that " 'by advising the defendant of his [or her] right *to* testify, the court could influence the defendant to waive his [or her] right *not to* testify, thus threatening the exercise of this other, converse, constitutionally explicit and more fragile right' " (alterations in original) (citation omitted)). The prosecution's comment on a defendant's failure to testify will be deemed improper if that comment was " 'manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *State v. Padilla*, 57 Haw. 150, 158, 552 P.2d 357, 362 (1976) (quoting *United States v. Wright*, 309 F.2d 735, 738 (7th Cir.1962)). *See also State v. Valdivia*, 95 Hawai'i 465, 482, 24 P.3d 661, 678 (2001) (quoting same). The prosecution may call attention to the fact that the testimony of prosecution witnesses has not been controverted "unless the circumstance that the defendant is the only one who could possibly contradict that testimony would necessarily direct the jury's attention solely to the defendant's failure to testify." *State v. Padilla*, 57 Haw. at 158, 552 P.2d at 362–63.

▮▮▮▮ During rebuttal argument, the prosecution directed the jury's attention to the fact that Kenneth did not testify by arguing the following: "Who was alone with her? He was alone with her. He was there. He would know. If he doesn't tell us, we can only look to Shirlene and see what her body

tells us." The prosecution argues to this court that this comment does not constitute misconduct because (1) it was not intended as a comment on Kenneth's silence and (2) neither defense counsel nor the court objected to the comment. We disagree. By reminding the jury that Kenneth did not testify, and by implying that Kenneth had information he was withholding from the jury, the prosecution manifestly intended the jury to note that Kenneth did not testify; furthermore, given the language used, the jury would naturally and necessarily interpret the prosecution's rebuttal argument as a comment on Kenneth's failure to testify.

### 2. Promptness or lack of curative instruction

Generally, we consider a curative instruction sufficient to cure prosecutorial misconduct because we presume that the jury heeds the court's instruction to disregard improper prosecution comments. *State v. Rogan*, 91 Hawai'i at 415, 984 P.2d at 1241. However, no curative instruction was given in this case. Therefore, this second factor weighs heavily in Kenneth's favor.

### 3. Strength or weakness of evidence against defendant

Upon review of the record, we cannot say that the prosecution's statements did not contribute to Kenneth's conviction. The evidence in this case does not clearly demonstrate Kenneth's guilt: the medical evidence suggesting strangulation was significantly disputed by Dr. Manoukian, there was no eyewitness testimony to confirm strangulation, and there was evidence suggesting that Shirlene may have suffered a heart attack. In short, the evidence was not so overwhelming that we are convinced the prosecution's intrusion on Kenneth's rights under article I, section 10 of the Hawai'i Constitution may not have contributed to Kenneth's conviction. *See, e.g., State v. Rogan*, 91 Hawai'i at 415, 984 P.2d at 1241 ("[I]t can hardly be said that the case against [the defendant], which hinged on the credibility of the Complainant, was so overwhelming as to outweigh the inflammatory effect of the deputy prosecutor's comments.").

Based upon the foregoing, we hold that the prosecution improperly commented on Kenneth's failure to testify in violation of his article I, section 10 right to remain silent. While defense counsel did not object to the improper comments (as discussed *infra*), we hold that the prosecutorial misconduct constitutes plain error which affected Kenneth's substantial rights. Kenneth is thus entitled to a new trial as a result of the prosecutorial misconduct. However, while the prosecutorial misconduct reached the level of reversible error, the misconduct was not so egregious that double jeopardy should attach to prevent retrial. *See State v. Rogan*, 91 Hawai'i at 423 n. 11, 984 P.2d at 1249 n. 11 ("We note and emphasize that the standard adopted for purposes of determining whether double jeopardy principles bar a retrial caused by prosecutorial misconduct requires a much higher standard than that used to determine whether a defendant is entitled to a new trial as a result of prosecutorial misconduct.").

### B. *Ineffective Assistance of Counsel*

We next turn to Kenneth's contention that he was denied his right to the effective assistance of counsel, guaranteed by article I, section 14 of the Hawai'i Constitution and the sixth amendment to the United States Constitution. In order to prove ineffective assistance of counsel, Kenneth has the burden to prove "1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *State v. Aplaca*, 74 Haw. at 66–67, 837 P.2d at 1305. To satisfy this second prong, Kenneth need only show a possible impairment of a potentially meritorious defense, not probable impairment or actual prejudice. *State v. Christian*, 88 Hawai'i at 419, 967 P.2d at 251.

Kenneth has met his burden of proof on this two-prong test to establish ineffective assistance of counsel. We examine each prong in turn.

### 1. Specific errors or omissions

Kenneth bases his claim of ineffective assistance of counsel on two primary errors

and omissions: (1) defense counsel's failure to object to the prosecution's rebuttal argument in which the prosecution improperly commented on Kenneth's failure to testify, and (2) defense counsel's cross-examination of Detective Cambra, during which Kenneth's counsel intentionally elicited Detective Cambra's opinion (and the evidence upon which Detective Cambra based his opinion) that Kenneth had murdered Shirlene by strangulation. We agree with Kenneth that the above actions by defense counsel were errors and omissions reflecting counsel's lack of skill or judgment.

### a. *Failure to object to prosecution's improper comments*

■ The Hawai'i Constitution gives Kenneth the right to remain silent, and the prosecution's comments in rebuttal argument were in clear violation of this right. Defense counsel's failure to object to these constitutionally improper comments could not conceivably have been based upon a legitimate tactic to benefit Kenneth's defense. Rather, the failure to object here is an omission reflecting defense counsel's lack of skill or judgment in protecting Kenneth's constitutional rights.

### b. *Elicitation of Detective Cambra's damaging opinion with supporting evidence*

■ In his cross-examination of Detective Cambra, defense counsel intentionally elicited Detective Cambra's opinion that Kenneth had murdered Shirlene by strangulation. Defense counsel also intentionally elicited Detective Cambra's testimony on the evidence substantiating that opinion. Prior to his asking for Detective Cambra's opinion with the jury present, Detective Cambra told the court—in a bench conference colloquy with defense counsel and the prosecution present—that his opinion was that Kenneth had indeed murdered Shirlene. Despite the court's warning ("Do you really want this person to give his opinion?") and the prosecution's objections to this line of questioning, defense counsel was undeterred and insisted that he elicit Detective Cambra's opinion with the jury present. In addition, after the

damaging testimony was elicited, the court gave defense counsel notice that Detective Cambra's opinion testimony would be stricken if defense counsel so requested. The court gave this notice because Detective Cambra was not qualified as an expert witness pursuant to HRE Rule 702, and the opinion he gave was not the type of opinion permitted by lay witnesses under HRE Rule 701. Despite the court's prompting, defense counsel did not request that the damaging testimony be stricken.

■ Kenneth contends that "[t]here is no conceivable way in which such a line of questioning would benefit the defense." We agree. The prosecution contends that the decision to elicit Detective Cambra's opinion was part of defense counsel's strategy to show that Detective Cambra was biased against Kenneth; the prosecution notes that Kenneth himself consented to this strategy on the record. While this line of questioning may well have been part of defense counsel's misguided strategy, this does not mean that defense counsel provided effective assistance to the defendant. For example, in *State v. Smith*, defense counsel chose to disclose all the defendant's prior convictions and incarcerations, despite the fact that the court had ruled in the defendant's favor on a motion in limine to exclude that evidence. 68 Haw. 304, 306–308, 712 P.2d 496, 498–99 (1986). Smith's defense counsel was therefore forewarned that evidence of the defendant's prior convictions was more prejudicial than probative, yet Smith's defense counsel neglected the court's warning and elicited this testimony. 68 Haw. at 312, 712 P.2d at 501. Despite the fact that Smith's counsel had a trial strategy, we held that Smith was entitled to a new trial because he did not receive effective assistance of counsel. 68 Haw. at 313–14, 712 P.2d at 502–03. Similarly, in this case, we find that defense counsel's intentional elicitation of Detective Cambra's opinion (together with supporting evidence) that Kenneth murdered Shirlene by strangulation was an error reflecting defense counsel's lack of skill or judgment in defending Kenneth.

### 2. Impairment of a potentially meritorious defense

Stated simply, we find that defense counsel's errors and omissions resulted in the

518

possible impairment of a potentially meritorious defense. We hold that Kenneth was denied effective assistance of counsel and is thus entitled to a new trial.

### C. Exclusion of Dr. Lawler's testimony

Although the previous two issues are dispositive of this case, we address the court's exclusion of much of Dr. Lawler's proffered testimony in order to provide some guidance on retrial.

 Dr. Lawler was board-certified in internal medicine and had a general practice. She treated Shirlene from 1996 to 1999 for a number of illnesses, both physical and emotional. As Shirlene's treating physician, she was well aware of Shirlene's emotional problems—including anxieties and their origins. Dr. Lawler was acutely aware of Shirlene's agoraphobia, as Dr. Lawler had to go to Shirlene's home to treat her. During the course of her treatment of Shirlene, Dr. Lawler tried to get psychiatric help for Shirlene, including suggesting that Shirlene admit herself to a psychiatric hospital. In short, Dr. Lawler was intimately familiar with Shirlene's emotional problems.

An expert witness need not possess the highest possible qualifications to testify about a particular matter. *Tabieros v. Clark Equipment Co.*, 85 Hawai'i 336, 396, 944 P.2d 1279, 1339 (1997). This rule is particularly true for a treating physician. *Holbrook v. Lykes Bros. S.S., Inc.*, 80 F.3d 777, 781–83 (3d Cir.1996) (finding reversible error where the district court precluded a treating physician from testifying as to his diagnosis of mesothelioma because the physician was not a pathologist or oncologist).

Based upon Dr. Lawler's status as Shirlene's treating physician, her familiarity with and treatment of Shirlene's emotional problems, and her attempts to get psychiatric care for Shirlene, the court erred in excluding Dr. Lawler's testimony about Shirlene's emotional problems on the basis that Dr. Lawler was neither a psychiatrist nor a psychologist.[13]

---

13. This testimony should not be excluded based on a hearsay objection. HRE Rule 803(b)(4) provides that statements made for purposes of

### IV. CONCLUSION

Based on the foregoing, we vacate the judgment of the circuit court and remand for a new trial.

medical diagnosis or treatment are not excluded by the hearsay rule.