Electronically Filed
Intermediate Court of Appeals
CAAP-21-0000325
05-JUL-2022
07:49 AM
Dkt. 68 SO

NO. CAAP-21-0000325

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
KRISTOPHER KALANI, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CPC-18-0000360)

**SUMMARY DISPOSITION ORDER**
(By: Leonard, Presiding Judge, Hiraoka and Wadsworth, JJ.)

Defendant-Appellant Kristopher **Kalani** appeals from the
**"Judgment** of Conviction and Sentence" entered by the Circuit
Court of the First Circuit on April 16, 2021.[1]  For the reasons
explained below, we affirm the Judgment.

On February 28, 2018, while high on crystal
methamphetamine, Kalani struck the complaining witness (**CW**)
several times in the face with a hammer.  On March 7, 2018, a
grand jury indicted Kalani for Attempted Murder in the Second
Degree, in violation of Hawaii Revised Statutes (**HRS**) §§ 705-500,
707-701.5, and 706-656.  A superseding indictment was filed on
March 21, 2018.  Kalani pleaded not guilty.

Jury selection began on February 3, 2020.  On
February 10, 2020, the jury found Kalani guilty as charged.  On

---

[1]     The Honorable Rowena A. Somerville presided.

April 16, 2021, Kalani was sentenced to life in prison without the possibility of parole. This appeal followed.

Kalani raises two points on appeal:

   A.   "The circuit court erred in failing to instruct the jury on the EMED [extreme mental or emotional disturbance] defense."

   B.   "Trial Counsel was ineffective for failing to establish a basis for the EMED defense."

   **A.   The circuit court did not err by declining to give an EMED instruction.**

"When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." State v. Sawyer, 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (citations omitted).

Evidence that a defendant, charged with attempted murder, was "under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation" (**EMED**), could mitigate the offense to attempted manslaughter.[2] HRS § 707-702(2) (2014).[3] However, "[i]f the record does not reflect any such evidence, then the trial court shall properly refuse to

_____

   [2]   The penalty for attempted second degree murder is "life imprisonment with possibility of parole." HRS § 706-656(2) (2014). The penalty for attempted manslaughter is twenty years. HRS §§ 707-702(3) (2014 & Supp. 2019), 706-659 (2014).

   [3]   HRS § 707-702 (2014) provides, in relevant part:

       (2)   In a prosecution for murder or attempted murder in the first and second degrees it is an affirmative defense, which reduces the offense to manslaughter or attempted manslaughter, that the defendant was, at the time the defendant caused the death of the other person, **under the influence of extreme mental or emotional *disturbance for which there is a reasonable explanation*.** The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be. (Emphasis added.)

instruct the jury on EMED manslaughter." <u>Sawyer</u>, 88 Hawai'i at 333, 966 P.2d at 645.

"The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be." HRS § 707-702(2). Thus, "[t]he ultimate test . . . is objective; there must be a 'reasonable' explanation or excuse for the actor's disturbance." <u>State v. Russo</u>, 69 Haw. 72, 77-78, 734 P.2d 156, 159 (1987) (citing Model Penal Code § 210.3 comment 3).

CW testified that Kalani smoked crystal methamphetamine "like almost every day." While they were together, Kalani choked and slapped her "about three times[.]" He told her he was going to kill her a couple of times. Each time the abuse happened after Kalani had been smoking crystal methamphetamine. February 28, 2018, was CW's birthday. Kalani wanted to go to a game room. CW wanted to spend the day with her family. They argued. She agreed to go to the game room. Kalani had smoked crystal methamphetamine two times that day. They went to the game room in her car. When they got to the game room they were arguing about CW not wanting to be there. They stayed in the game room for about an hour. They left and went back to her car. They were arguing because it was CW's birthday and she didn't want to be there at the game room. Kalani was angry. He said he was going to kill her. They left in her car with Kalani in the front passenger seat. CW drove. They came back to the game room. In the parking lot, CW put up a sun visor and lit a cigarette. Kalani had moved to the back seat behind her. CW described what happened next:

> Q. . . . [A]fter you lit the cigarette, what do you remember happening next?
>
> A. My hammer came to my face.
>
> Q. Did [Kalani] hit you?
>
> A. Yes.
>
> Q. Tell the jury what you remember about this.

3

A.    I remember my hammer coming toward my face and my teeth flying out.

Q.    [CW] --

A.    Yes.

Q.    -- did I hear you say that you saw the hammer coming toward your face and your teeth flying out?

A.    Yeah.

Q.    Do you remember where the hammer hit you?

A.    Here on the right side of my -- (indicating)

Q.    So you're indicating with your right hand, your fingers extended, to the lower part of your right jaw?

A.    Yes.

Q.    What do you remember happening next?

A.    I went dizzy already.  I went dizzy.  I no remember nothing after that.

    . . . .

Q.    . . . Before you were struck with the hammer, did [Kalani] say anything to you?

A.    I going kill you.

Kalani testified in his own defense.  He and CW had been in an intimate relationship for about nine months.  During that time, he and CW smoked crystal methamphetamine "[a] lot[.]"  Kalani testified that he had "anxieties so I guess when I'm smoking, it's -- just intensifies it even more."  When Kalani and CW broke up, Kalani called CW and asked her to get back together "on couple occasions."  At times during their relationship, Kalani thought CW might have been fooling around with somebody else.  He felt "[c]onfused, hurt."  On February 28, 2018, CW's birthday, Kalani was smoking and he and CW were arguing, but Kalani said, "I don't know why."  At some point he and CW went to a game room.  Kalani testified:

Q.    Okay.  And what happened at the game room?

A.    We went in, and I just felt uncomfortable in there.

Q.    And why is that?

A. 'Cause I felt like everybody was targeting me, I guess.

Q. What was that? Everybody was?

A. I felt like everybody was like just all up in my business, just -- I don't know. I just felt like everybody was looking at me.

Q. And why did you think everybody was looking at you?

A. Well, could be 'cause I was high.

Q. Okay. But you don't really know then?

A. It was a lot of things running through my mind why, you know. But thinking about it now, it's like I don't know why I was thinking like that.

Q. Okay. So there's no particular reason that really sticks out?

A. Right.

Q. And so, you know, [CW] said she decided that she wanted to leave, and you guys were arguing about wanting to leave. What was that all about?

A. Well, I wanted to leave. But we didn't argue, but I was telling her that I felt uncomfortable and I wanted for leave the game room.

Q. Mh-hm. And what did she want?

A. She wanted for stay and have fun, play.

Q. Okay. And you folks eventually got out of that game room, right?

A. Yes.

Q. Where did you guys go?

A. So we got back in the car.

Q. Okay, who was driving?

A. [CW].

Q. And where did you sit?

A. In the passenger side, passenger seat.

Q. Passenger seat?

A. Yes.

Q. In the front?

A. Yes.

Q.    And where'd you guys go?

A.    We went to the bank.

Q.    And then what happened?

A.    She went in the bank, and I sat in the back.  I -- I jumped over the seat to sit in the back.

Q.    And you went sat in the back seat?

A.    Yes.

Q.    And she came out?

A.    Yes.

Q.    She got in the driver's seat?

A.    Yes.

Q.    She drove back to the game room?

A.    Yes.

Q.    Meanwhile, you're in the back seat?

A.    Yes.

Q.    And this is the Tahoe, right, that we saw pictures of?

A.    Yes.

Q.    Okay.  So we also saw pictures of the sunscreen sheet up on the front of the windshield.  Why was -- who put that up there?

A.    She did.

Q.    Why was that put up there?

A.    For -- so we can smoke.

Q.    So you can smoke?

A.    Yeah.

Q.    You didn't want to show people --

A.    Yes.

Q.    You know, so are the windows -- you know, the windows on the side, are they tinted?

A.    Yes.

Q.    So what happened?  You guys smoked and then?

A.    And I hit her.

Q.    You hit her?

A.      Yes.

Q.      With what?

A.      The hammer.

Q.      Yeah.  And when you did that, do you know why you did that?

A.      Honestly, I don't know why I did that.

Q.      And do you --

A.      No.

Q.      -- know that you could have possibly killed her?

A.      Was a possibility that hitting her with that, a chance of her dying.

Q.      Okay.  And then after this happened, where did you go?  You got out of the car?

A.      Yes.

Q.      Did you, as the video shows, open the front door -- the driver's door and go --

A.      Yes.

Q.      -- look at her?

A.      Yes, I did.

Q.      Did you say anything to her?

A.      No.

Q.      Prior to her -- you hitting her, did she say anything?

A.      No.

Q.      And did you say anything?

A.      No.

Q.      Okay, so after you closed the front door, where did you go?

A.      The front driver's side door.

Q.      What did you -- you mean after you closed that door, you went somewhere?

A.      I walked around and opened up the passenger side door.

Q.      Why did you do that?

A.      So that the light can come on in the car.

Q.     Why do you want the light to come on?

A.     'Cause had people around in the parking lot at that time.

Q.     Okay.

A.     And I guess I was hoping that somebody would see her.

Q.     Okay.  And then you did that and then what?

A.     And I left.

Q.     You left.  You didn't do anything to call for help or anything like that?

A.     No.

The circuit court declined to instruct the jury on EMED, over defense counsel's objection:

> THE COURT:  Okay, I do not find that there is any rational basis to have this instruction.  I don't believe that the defendant acted with such loss of self-control that resulted from a [sic] extreme mental or emotional disturbance.  He testified that, first of all, he had no explanation for why he did what he did or excuse.  And, in fact, he said his thinking was impaired by drugs.  What he did was a result of the drug use, and what he did was a result of his impaired thinking.  That does not rise to extreme mental or emotional disturbance. He testified that he was high on meth, paranoid, and anxious.  But that, too, does not give rise to extreme mental or emotional disturbance.  So I am going to refuse this over objection of defense.

1.     **The record does not reflect any evidence of a subjective nature that Kalani acted under a loss of self-control resulting from extreme mental or emotional disturbance.**

Kalani asserts that "the circuit court erred in failing to instruct the jury on EMED where there was support in the evidence for that instruction[.]"

Kalani did not testify that he was acting under any mental or emotional disturbance.  He testified that: he did not know why he hit CW with a hammer; he knew that hitting her in the face with a hammer could kill her; prior to hitting CW, neither he nor CW said anything; and that CW did nothing to provoke him.

8

Kalani's contention that the evidence of his behavior after the incident showed that he was under the influence of EMED at the time of the incident is without merit. EMED is considered "at the time the defendant caused the death of the other person" not the defendant's mental state hours after. HRS § 707-702(2); State v. Moore, 82 Hawaiʻi 202, 210-11, 921 P.2d 122, 130-31 (1996) (finding that the defendant's agitation and nervousness ***at the time of his arrest*** were not relevant to an EMED inquiry).

Kalani also points to generalized testimony that at times during his relationship with CW, he believed that she was cheating on him.[4] Without more, this testimony is not probative of Kalani's subjective loss of self-control ***at the time of*** the incident. See State v. Aganon, 97 Hawaiʻi 299, 304, 36 P.3d 1269, 1274 (2001) (holding that trial court did not plainly err in declining to give an EMED instruction where defendant only presented "generalized testimony that she sometimes loses her temper in stressful situations" and that the decedent infant "could cry a lot").

We conclude that the circuit court properly declined to give an EMED instruction because the record did not reflect Kalani's subjective loss of self-control.

> **2.    The evidence did not reflect that Kalani acted under the influence of a reasonably induced loss of self-control.**

Kalani concedes that during trial, the basis for his request for an EMED instruction was that he was "extremely high on [crystal] methamphetamine[.]" For the first time on appeal, Kalani contends that his "***chronic use*** of crystal methamphetamine could have caused him to suffer an extreme mental or emotional disturbance." (Emphasis added.) "Normally, an issue not preserved at trial is deemed to be waived. But where plain

---

[4]    Kalani also asserts in his opening brief, but does not cite to the record, that he "believed that [CW] was trying to leave him." The record does not support this assertion.

errors were committed and substantial rights were affected thereby, the errors may be noticed although they were not brought to the attention of the trial court." State v. Fagaragan, 115 Hawaiʻi 364, 367-68, 167 P.3d 739, 742-43 (App. 2007) (cleaned up).

HRS § 702-230(1) (2014 & Supp. 2019) provides that "[s]elf-induced intoxication is prohibited as a defense to any offense, except as specifically provided in this section." Loss of self-control due to voluntary intoxication cannot be said to be "reasonably induced." See HRS § 702-230 (2014 & Supp. 2019).

In his opening brief, Kalani does not cite HRS § 702-230, but he instead relies on State v. Abion, 148 Hawaiʻi 445, 478 P.3d 270 (2020). Abion was decided after Kalani's trial concluded but before he was sentenced. Abion and State v. Young, 93 Hawaiʻi 224, 999 P.2d 230 (2000) consider whether permanent mental illness attributable to substance use precludes an HRS § 704-400 defense ("Physical or mental disease, disorder, or defect excluding penal responsibility") due to the self-induced intoxication exception of HRS § 702-230.

In Young, the supreme court declined to adopt Young's argument that "a drug-induced mental illness is a defense" because the court found "to do so would be contrary to the legislative intent underlying HRS §§ 702-230 and 704-400." 93 Hawaiʻi at 232, 999 P.2d at 238.

In Abion, the supreme court held that expert testimony of Abion's "permanent mental impairment resulting from voluntary intoxication" was erroneously precluded at trial where the defendant "was not using methamphetamines on the day of his offense or several days preceding" it. 148 Hawaiʻi at 457-59, 478 P.3d at 282-84. The court construed Young "in light of its circumstances and factual findings" and concluded that "while permanent mental impairment resulting from voluntary intoxication may be a defense, temporary impairment resulting from voluntary intoxication is not." Id. at 456-57, 478 P.3d at 281-82 (citations omitted).

In this case, at the time of the incident Kalani was admittedly high on methamphetamine.  Unlike <u>Abion</u>, Kalani proffered no expert testimony or other evidence that he sustained permanent mental impairment from chronic methamphetamine use.  Under those circumstances the circuit court did not err in declining to give the jury an EMED instruction.

**B.    Kalani did not meet his burden of establishing he was denied effective assistance of trial counsel.**

> The defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

<u>State v. Wakisaka</u>, 102 Hawaiʻi 504, 514, 78 P.3d 317, 327 (2003) (cleaned up).

Kalani asserts that "if this Court holds that there was no rational basis in the evidence for an EMED instruction" then trial counsel "was ineffective for failing to adduce evidence or testimony in support of that defense."  Kalani's counsel asserts that "[i]nstead of focusing on evidence relevant to Kalani's mental or emotional state at the time of the incident and developing questioning on these issues, Trial Counsel focused on Kalani's self-induced intoxication on methamphetamine."  Kalani then points to "several responses that could have been further developed to establish his extreme mental and emotional distress at the time of the incident."

Here, Kalani's assertion that further questioning would have led to evidence supporting an EMED defense is purely speculative.  <u>See</u> <u>State v. Reed</u>, 77 Hawaiʻi 72, 84, 881 P.2d 1218, 1230 (1994) <u>overruled on other grounds by</u> <u>State v. Balanza</u>, 93 Hawaiʻi 279, 1 P.3d 281 (2000) (holding that without supporting affidavits or sworn statements, the defendant's characterization of the witnesses' potential testimony "amounts

11

to nothing more than speculation").  It is completely unknown what Kalani's testimony would have been.  Kalani's claim of ineffective assistance of counsel is unaccompanied by any affidavits or sworn statements from Kalani indicating the substance of the testimony he claims he would have provided if he was questioned further at trial.  Thus, Kalani's ineffective assistance of counsel claims are without merit.

For the foregoing reasons, the circuit court's "Judgment of Conviction and Sentence" entered on April 16, 2021, is affirmed.

DATED:  Honolulu, Hawaiʻi, July 5, 2022.

On the briefs:

Randall K. Hironaka,
for Defendant-Appellant.

Stephen K. Tsushima,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge