170 P.3d 357

**Freedus W. WILTON, II,**
**Petitioner/Petitioner–**
**Appellant**

**v.**

**STATE of Hawai'i,**
**Respondent/Respondent–Appellee.**

**No. 27129.**

Supreme Court of Hawai'i.

Nov. 13, 2007.

Jon N. Ikenaga, Deputy Public Defender, for Petitioner/Defendant–Appellant.

Peter A. Hanano, Deputy Prosecuting Attorney, County of Maui, for Respondent/Plaintiff–Appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

Petitioner/Petitioner–Appellant Freedus W. Wilton, II (Petitioner) filed a petition for writ of certiorari on June 29, 2007. Certiorari was accepted on August 7, 2007, and oral argument was held on October 17, 2007.[1]

Petitioner seeks review of the judgment of the Intermediate Court of Appeals (the ICA) filed on April 12, 2007, pursuant to its March 21, 2007 Summary Disposition Order (SDO),[2] affirming the December 1, 2004 "Findings of Fact, Conclusions of Law, and Order Denying Petition to Vacate, Set Aside, or Correct Judgment or to Release Petitioner from Custody," filed by the Circuit Court of the Second Circuit[3] (the court). Respondent did not file a memorandum in opposition.

We respectfully vacate the April 12, 2007 ICA judgment and the court's December 1,

1. John Ikenaga argued for Petitioner. Peter Hanano argued for Respondent/Respondent–Appellee State of Hawai'i (Respondent).

2. The SDO was issued by Chief Judge James S. Burns and Associate Judges Daniel R. Foley and Alexa D.M. Fujise.

3. The Honorable Joel E. August presided.

4. HRPP Rule 40, entitled Post–Conviction Proceeding, provides in pertinent part:

> **(a) Proceedings and Grounds.** The post-conviction proceeding established by this rule shall encompass all common law and statutory procedures for the same purpose, including habeas corpus and coram nobis.... Said proceeding shall be applicable to judgments of conviction and to custody based on judgments of conviction, as follows:
> (1) *From Judgment.* At any time but not prior to final judgment, any person may seek relief under the procedure set forth in this rule from the judgment of conviction on the following grounds:
> ....
> (v) *any ground which is a basis for collateral attack on the judgment.*
> ....
> **(f) Hearings.** *If a petition alleges facts that if proven would entitle the petitioner to relief, the court shall grant a hearing which may extend*

2004 findings and conclusions and order, and remand for an evidentiary hearing under Hawai'i Rules of Penal Procedure (HRPP) Rule 40 (2007)[4] for the reasons stated herein.

I.

The following matters, some verbatim, are from the record and the submissions of the parties. The pertinent incident facts taken from the application, state in relevant part:

> [O]n January 27, 1997, a ski-mask-wearing intruder wielding a knife broke into the condominium of Mary Paulsen (Mary) and her sons, Jon and Jeff. Mary was stabbed and cut multiple times[.] ... *[N]either Mary, Jon or Jeff saw the intruder's face, but all described him as a large man, with a pot-belly, weighing approximately 220 pounds.* The perpetrator ran from the unit and was pursued by security guard Christ Hoerner (Hoerner). *Hoerner pursued the perpetrator for a significant period of time and described him as 6' to 6'1" tall, weighing over 200 pounds, with blonde hair.*

> *only to the issues raised in the petition or answer. However, the court may deny a hearing if the petitioner's claim is patently frivolous* and is without trace of support either in the record or from other evidence submitted by the petitioner. *The court may also deny a hearing on a specific question of fact when a full and fair evidentiary hearing upon that question was held during the course of the proceedings which led to the judgment or custody which is the subject of the petition or at any later proceeding.*
> *The petitioner shall have a full and fair evidentiary hearing on the petition.* The court shall receive all evidence that is relevant and necessary to determine the petition, including affidavits, depositions, oral testimony, certificate of any judge who presided at any hearing during the course of the proceedings which led to the judgment or custody which is the subject of the petition, and relevant and necessary portions of the transcripts of prior proceedings. The petitioner shall have a right to be present at any evidentiary hearing at which a material question of fact is litigated.
> *Where the petition alleges ineffective assistance of counsel as a ground upon which the requested relief should be granted, the petitioner shall serve written notice of the hearing upon the counsel whose assistance is alleged to have been ineffective and said counsel shall have an opportunity to be heard.*
> (Boldfaced font in original.) (Emphases added.)

[Petitioner's] actual physical appearance differed significantly from the description of the perpetrator given by the witnesses. *[Petitioner] was about 5'10" tall and weighed 190 pounds, and had brown hair.*

... When the police arrived at the scene, they *recovered a Chicago Bulls baseball cap and a .38 caliber handgun. The gun was registered to [Petitioner] and some witnesses testified that they had seen him wearing a similar (but not necessarily identical) cap.* Some hair samples were found in the cap, but [Respondent's] expert witnesses could only testify that the hairs "could" have originated from [Petitioner] and that the DNA was "potentially" his. In fact, *after extensive testing for fingerprints and DNA, no blood, fingerprints or other physical evidence linking [Petitioner] to the crime were found* at the scene or on his person or items in his apartment.

... *[D]efense counsel[, David Sereno (Sereno),] did not present any evidence to counter [Respondent's] circumstantial evidence supposedly identifying [Petitioner] as the perpetrator.*

(Emphases added.)

After a four-day jury trial, Petitioner was convicted of (1) burglary in the first degree, (2) robbery in the first degree, (3) attempted murder in the first degree, (4) place to keep firearms, (5) carrying or use of a firearm in the commission of a separate felony, and (6) use of a deadly or dangerous weapon in the commission of a crime. The court[5] sentenced Petitioner to concurrent terms of (1) life imprisonment without the possibility of parole for the attempted murder conviction, (2) twenty years each for the robbery and carrying or use of firearm convictions, (3) ten years each for the burglary and place to keep firearms convictions, and (4) five years for the use of a deadly or dangerous weapon conviction. Additionally, the court imposed restitution in the amount of $15,800.

Subsequently,

[i]n his [March 20, 2001] HRPP Rule 40 petition ..., *[Petitioner] raised the issue of ineffective assistance of trial counsel for* failing to present evidence that would have excluded him as the perpetrator .... [Petitioner] noted that Hoerner ... stated that the perpetrator had outrun him for a significant distance and at one point had fallen, rolled and then gotten back to his feet and continued to run. However, *[Petitioner] had presented trial counsel with evidence that he suffered from [multiple sclerosis (MS)], resulting in "... permanent damage to the motor movement skills of my left leg,"* making it impossible for him to have run in the manner described by Hoerner. The ... materials provided to trial counsel prior to trial by [Petitioner] *included copies of his medical records and affidavits from the Department of Public Safety, a private investigator acquaintance, and a Colorado physician.* [Petitioner] also included *a prior-to-trial memorandum he had sent to trial counsel informing him of his disability.*

....

*A "return day" on the [HRPP Rule 40 Petition] was set on October 15, 2004. [Petitioner] was not present at the hearing as he was incarcerated at a Mainland facility and his presence was waived by [counsel].*

On the "return day" the court[6] expressed its inclination to deny Petitioner's HRPP Rule 40 petition because it had difficulty "even get[ting] to a point where there's sort of a colorable claim of ineffective assistance of counsel[,]" noting that the record contained

some declarations or affidavits by [Petitioner's] counsel at the time and by [Petitioner] that they [had] reviewed this matter thoroughly, they had very, you know, intense *discussions,* that counsel signed a declaration, that she[, Vicky Russell (Russell), Petitioner's appellate counsel,] had spoken to trial counsel [Sereno] about his situation and who was a very experienced, even then, criminal defense attorney and had spoken to the investigator involved.

*So there are a number of things said under oath indicating that not only with regard to the allegations of ineffective [as-*

---

5. The Honorable Artemio C. Baxa presided.

6. The Honorable Joel E. August presided.

*sistance] down below during the trial,* but with regard to having spent time with [Petitioner] discussing the benefits or lack thereof of an appeal versus a [HRPP] Rule 40 petition, when you have statements under oath by [Petitioner] and by his counsel.

(Emphases added.)

On the return day, the court heard argument regarding Petitioner's allegations that his appellate counsel rendered ineffective assistance, but there was no argument regarding his claims of ineffective assistance of trial counsel. The court ruled immediately on the HRPP Rule 40 petition without receiving any further evidence. The court's oral ruling declared that it appeared

that whatever decisions were made *were based on strategy as opposed to some failure to adequately, you know, represent [Petitioner] on Mr. Sereno's part.*

*I think there may have been very good reasons why certain matters were not brought before the jury,* particularly with regard to the underlying disease which [Petitioner] was claiming had a significant effect on his ability to move. . . .

And I've read . . . the *Tachibana* colloquy that went on between the court and [Petitioner], and *it's quite clear there was an adequate colloquy.*

(Emphases added.)

On December 1, 2004, the court filed its Findings of Fact, Conclusions of Law, and Order Denying Petition to Vacate, Set Aside, or Correct Judgment or to Release Petitioner from Custody.

## II.

The ICA affirmed. The ICA decided Petitioner "has not met his burden of establishing ineffective assistance of counsel by showing 'specific errors or omissions,'" SDO at 8 (quoting *State v. Wakisaka,* 102 Hawai'i 504, 514, 78 P.3d 317, 327 (2003)), and "failed to show that the alleged specific errors or omissions of his trial counsel resulted in the possible impairment of a potentially meritorious defense," *id.*

## III.

■ The question presented by Petitioner is "[w]hether the ICA gravely erred in holding that the [court] did not err in denying [Petitioner's] HRPP Rule 40 petition where his trial counsel's failure to present exculpatory evidence in his defense constituted ineffective assistance of counsel[.]" Petitioner argues the "court's decision was erroneous for two reasons, first because the [court] utilized an incorrect standard in ruling on the merits of [the] Rule 40 petition and second because the [court's] findings of fact [ (findings) ] and conclusions of law [ (conclusions) ] upon which its ruling was based were in error."[7] Petitioner correctly maintains that the applicable standard imposes the burden of establishing ineffective assistance of counsel on the defendant, requiring him to prove

1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) *that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." State v. Aplaca,* 74 Haw.

---

7. The following established standards apply. "'A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.'" *Foo v. State,* 106 Hawai'i 102, 112, 102 P.3d 346, 356 (2004) (quoting *State v. Okumura,* 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995)).

"Substantial evidence" means "'credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to reach a conclusion.'" *State v. Bui,* 104 Hawai'i 462, 467, 92 P.3d 471, 476 (2004) (quoting *State*

*v. Silva,* 75 Haw. 419, 432, 864 P.2d 583, 590 (1993) (ellipses, brackets, and citations omitted)). Furthermore, "appellate courts will give due deference to the right of the trier of fact 'to determine credibility, weigh the evidence, and draw reasonable inferences from the evidence adduced.'" *In re Doe,* 107 Hawai'i 12, 19, 108 P.3d 966, 973 (2005) (quoting *State v. Lubong,* 77 Hawai'i 429, 432, 886 P.2d 766, 769 (App.1994) (citation omitted)).

"The circuit court's conclusions of law are reviewed under the right/wrong standard." *State v. Diaz,* 100 Hawai'i 210, 216, 58 P.3d 1257, 1263 (2002) (quotation marks and citations omitted).

[54,] 66–67, 837 P.2d [1298,] 1305 [ (1992) ]. *To satisfy this second prong, [the defendant] need only show a possible impairment of a potentially meritorious defense, not probable impairment or actual prejudice. State v. Christian,* 88 Hawai'i [407,] 419, 967 P.2d [239,] 251 [ (1998) ]

*Wakisaka,* 102 Hawai'i at 516–17, 78 P.3d at 329–30.

(Emphasis in original and emphases added.)

### IV.

The court's findings relevant to the facts adduced at trial and unchallenged by the application except for 9 and 22 are as follows:

1. On January 27, 1997, a burglar broke into Unit B118 of the Maui Sunset located on South Kihei Road, Kihei Maui, Hawai'i *at about 3:00 a.m.* through a lanai screen door.

2. *[Mary] was sleeping on the living room sofa inside Unit B118, and when she awoke, the burglar attacked her,* repeatedly stabbing her with a knife.

3. *Mary's two sons, Jeff, age 23, and Jon, age 26, were asleep in the bedroom and were awakened by Mary's screams. When Jon ran out of the bedroom, he encountered the assailant,* who stabbed Jon in the right forearm.

4. *Jeff then got into a struggle with the assailant in the hallway,* and received injuries to his chin and forearm from the assailant's knife.

5. *Security guard [Hoerner] heard the screams* from Unit B118, *and when he yelled at the assailant, the assailant ran* out the front door.

6. *Hoerner chased the assailant through the Maui Sunset parking lot toward South Kihei Road. The assailant fell at the edge of the lot, rolled into a sitting position, recovered the knife that fell out of his hand, then ran across the street into a* small housing area, throwing or dropping an underwater camera and scuba dive computer as he ran.

7. Across South Kihei Road, *Paula Behnken was awakened by loud panting in her yard, saw a large shadow pass over* her wall, heard something moving against the shed in her yard, and heard the poinciana pods in her yard being crunched as though someone was walking on them.

8. *Behnken's next-door neighbor, Kathy Enns, was in bed when she heard a loud panting alongside the wall* next to her bed. The panting left when the sounds of sirens approached.

9. *The Paulsens' [sic] and Hoerner described the assailant as wearing dark long-sleeved clothing, gloves and a ski mask.*

10. *The assailant dropped a gun and a Chicago Bulls cap in Unit B118 sometime before he ran out of the unit.*

11. The gun found in Unit B118 was registered to Petitioner.

12. *Before the offense, Petitioner owned a Chicago Bulls cap* identical to the one found in B118.

13. *When contacted by police, Petitioner had an injury to the bridge of his nose* which he said he received when he bumped into a wall.

14. Petitioner had no alibi except that *he claimed to have been bike riding between 3:00 a.m. and 5:30 a.m.*

15. In a search of his residence by police, *Petitioner's registered gun and Chicago Bulls cap were missing.*

16. Petitioner claimed not to know when he had lost the Bulls cap.

17. Petitioner had a jury trial from April 6, 1998, to April 13, 1998, and was represented by counsel, [Sereno].

18. *At trial, Jonathan Good, a coworker of Petitioner, testified that he saw the Chicago Bulls cap on Petitioner on an employee's cruise on January 24, three days prior* to the date of the offenses.

19. At trial, Maui Police Department Detective Brian Kaya testified that *Petitioner lived within two miles of the Maui Sunset.*

20. The evidence at trial established that *Petitioner worked at The Maui Dive Shop at the time of the offense, was working toward certification as a scuba diver,* and scuba dove in dive tour[s] conducted by his employer.

21. The evidence at trial also established that *Petitioner rode a bicycle for transportation. Petitioner's bicycle was admitted into evidence at the trial.*

22. At trial, *Petitioner's Pentab notebook, with notes of martial arts exercises, was admitted into evidence,* as was the testimony of *Adrienne Brown, who testified that Petitioner asked her for $5,000.00 so he could go to Japan to study his marital arts further.*

23. Maui Police Department Lieutenant Glenn Cuomo testified at trial the *Petitioner told Cuomo that he was a pig hunter.*

24. *Also admitted into evidence at trial were nine pages of detailed handwritten notes* that police recovered from Petitioner and *that related to events that occurred before, during and after the offense.*

25. On April 6, and April 13, 1998, during trial, the *court provided Petitioner with two advisements pursuant to State v. Tachibana,* 79 Hawai'i 226, 231, 900 P.2d 1293, 1298 (1995), *of his right to testify, and Petitioner advised the court that he understood his right to testify and responded "yes" when the court asked him if the decision not to testify was his decision.*

26. *Petitioner did not testify at his trial.*

27. *Petitioner's trial counsel did not call any witnesses or enter other evidence* for the defense during the trial.

28. On April 13, 1998, the jury found Petitioner guilty of the offenses of Burglary in the First Degree (Count One), Robbery in the First Degree (Count Two), Attempted Murder in the First Degree (Count Three), Place to Keep Firearm (Count Four), Carrying or Use of Firearm in the Commission of a Separate Felony (Count Five), and Use of Deadly or Dangerous Weapon in the Commission of a Crime (Count Six).

(Emphases added.)

Relevant procedural and post conviction matters as found by the court and unchallenged by the application are as follows:

30. Petitioner was convicted and sentenced for the foregoing offenses on July 30, 1998.

31. *[Sereno] represented Petitioner at trial,* and [Russell] represented Petitioner at his sentencing on July 30, 1998, and for portions of both of Petitioner's post-conviction proceedings.

. . . .

37. *In the present matter, Petitioner,* through Ms. Russell, *filed a Verified Petition* to Vacate, Set Aside, Or Correct Judgment Or To Release Petitioner From Custody on March 20, 2001, *alleging that Petitioner's trial counsel was ineffective because (1) counsel did not adduce evidence that Petitioner has [MS] and therefore was unable to run, as did the Paulsens' assailant, (2) did not let Petitioner testify at trial, (3) did not call [Krau] as a witness to testify that he advised Petitioner to keep the handwritten notes which were part of the evidence at trial, and (4) did not adduce any evidence as part of a defense case-in-chief.*

38. On October 19, 2001, Petitioner moved to amend his petition, and on October 28, 2002, Petitioner's Motion To Reinstate HRPP Rule 40 Petition With Pro Se Addendum, In–Forma Pauperis And Request For Appointment Of Counsel Motions was filed.

39. On May 28, 2004, the Court filed it [sic] Order Directing Office Of The Public Defender To File Amended Rule 40 Petition On Petitioner's Behalf And Directing State To File Response To Said Petition.

(Emphases added.)

V.

Apparently, as noted by the court, the fact that Petitioner had MS was not presented at trial. Among the items attached to Petitioner's petition were five pertinent items.

A.

First, Petitioner's February 5, 2001 affidavit declared:

I stated to [Sereno] both in writing in that letter and I also stated directly to [Sereno], verbally, that I have permanent dam-

age to the motor movement skills of my left leg, and my left leg is incapacitated as a result of my having had [MS] for many years.

Petitioner indicated that "[t]he disability afflicting my left leg was diagnosed as [MS] in 1989; I have been unable to run due to that disability [for] some time prior to the diagnosis in 1989," his medical records "show my history of [MS] and the effect of the disease on my gait, such that any competent medical expert could have described the meaning of ... those records[,]" and "I informed my trial attorney, [Sereno] of my [MS] induced disability, and on more than one occasion attempted to provide trial attorney [Sereno] copies of my medical records showing the [MS] disability so that [Sereno] would be able to review and use that information defensively at trial."

As to his desire to testify, Petitioner averred that "although I repeatedly stated my wish to testify to [Sereno], and in particular, with regard to my disability and inability to run and my keeping notes on the recommendation of Mr. Krau, I was repeatedly dissuaded from my wish by my attorney."

### B.

Second, an apparent undated pretrial letter from Petitioner to Sereno indicated Petitioner advised Sereno he could do a jog for a short distance but not run because of MS, and that he believed it was "important to speak to the jury." [8]

### C.

Third, a November 1, 2000 affidavit of Ira Chang, M.D., indicated the doctor examined medical records from Colorado which showed Petitioner was "first seen in 1989 for the following symptoms: a) recurrence of double vision; b) left-sided clumsiness; c) difficulty with walking due to difficulty with [sic] use of right leg," an "examination showed that [Petitioner's] left leg exhibited an upper motor neuron pattern of weakness; [Petitioner's] gait was such that he had a tendency to fall to the left on tandem walking and to have somewhat poor ankle dorsiflexion on heel walking," and upon further testing, Petitioner was "ultimately diagnosed with the disease of [MS]."

### D.

Fourth, a State of Hawai'i Department of Public Safety Consultation Record of February 10, 2000, indicated Petitioner has a "history of symptoms of [MS] that began in 1989 ... and presents records that seem to support the diagnosis of [MS from] the Rocky Mountain Multiple Sclerosis Center in Colorado." The consultation record examiner stated that, "although [Petitioner] has rec-

---

8. Petitioner attached a copy of this undated redacted letter from Petitioner to his attorney prior to trial to his original Rule 40 petition. Petitioner also attached an affidavit in which he attested to the contents of the letter. In his letter, Petitioner explained that he "put together [a] list of information, ideas and questions for [counsel's] perusal" and stated that he would appreciate it if counsel "would look them over and give [him] an answer to the questions and [an] opinion on the ideas and information" contained therein. The letter states in pertinent part:

— *I am not able to run, especially sprint. I can do a very slow deliberate jog for a short distance but it is at a pace that most people can walk faster. The reason for this is that [MS] has caused a permanent damage to the motor movement skills on my left side, mostly in the left leg.* It is not so severe that I cannot walk. I ride my bicycle as a form of therapy and exercise. Because I have toe clips on the pedals I can use my right leg to assist my left leg when it gets fatigued and still get a lot out of the exercise for my left leg.

— My Judo abilities have been drastically changed, I can no longer move with the agility and speed that I once had. However with my experience and upper-body strength (although greatly diminished) I can still workout and hold my own with most Judo players.

[Redacted text]

I have read in some of the material[s] I have gone through in the Law Library about a *defendant being able to enter a statement into the record at trial without being cross-examined. Is this something that can be done in Hawaii? If the trial is going well and you don't want me to testify could that be a possibility?* I haven't been able to find where I read it, don't know if it is a currently allowed rule or if maybe I read it in a paperback book about a trial, I do get confused and forgetful at time ([MS]). *But no matter where I read it I think it is important to speak to the jury in one way[,] shape[,] or form.* I am going to mail this to you today as I want you to have an opportunity to go over it before we talk again.

(Emphases added.)

ords documenting that neurologists have said that he has [MS], I do not have records documenting the exact imaging or laboratory testing that supported this diagnosis." The examiner noted that "[t]he patient previously had episodes of weakness in the lower extremities and diplopia." The examiner also noted that Petitioner had an "eight or nine month history of mild increased fatigue, occasional double vision, and occasional increase in stiffness, primarily in the lower extremities on the left."

### E.

Fifth, also attached to Petitioner's Rule 40 petition was a January 25, 2001 affidavit of Krau, a licensed private investigator and neighbor of Petitioner. Krau's affidavit may be considered in two respects.

Krau's affidavit declared he has known Petitioner "for some years, including a significant period of time prior to his arrest on the charges at issue herein." According to Krau, he was Petitioner's neighbor in Kihei, Maui, and had "numerous opportunities to observe him walk, attempt to jog and ride his bicycle." Krau noted that "when walking, [Petitioner] has a distinct gait which cause[s] him to limp due to weakness in the left side of his body." "When jogging," Krau explained, "it is impossible for [Petitioner] to do so for any distance." Additionally, "when attempting to exercise by jogging, [Petitioner's] gait is slow, labored[,] and hampered by a heavy limp due to the weakness in the left side of his body."

Krau also stated in his affidavit that he was aware that Petitioner "traveled by bicycle and I am familiar with the toe clips on [his] bicycle." As Krau explained, "the toe clips were in place, not as racing clips, but in order for him to use his right leg to pull up on the clip in order to compensate for the weakness in his left leg. . . ." Finally, Krau stated that he was "aware of the distance the perpetrator in this case ran in order to elude pursuit by the Maui Sunset condominium security guard at full chase," and "would estimate that distance to be not less than 500 feet."

As to the second aspect, Krau stated in his affidavit that "[s]hortly after [Petitioner] had engaged in his first discussion with the police, he contacted me and I instructed him to take notes and to write down everything he could remember about the victims, any contact he may have had with them, and any other information which may be of value in order to help the police during their investigation." Krau further stated that "[i]t was at my instruction that these notes were made after the fact of the crime in order to facilitate the police investigation." However, as indicated *infra*, it does not appear the application focuses on this aspect of Krau's affidavit.

### VI.

The court's findings (apparently inferred from the matters in the record) that reject Rule 40 relief are as follows, findings 41, 42, 44 and 45 being specifically highlighted by Petitioner for challenge:

41. From the record it appears that Petitioner's *trial counsel's failure to adduce evidence of Petitioner's [MS] through Petitioner or other witnesses was not an error or omission* reflecting a lack of skill, judgment, or diligence, and it did not result in the withdrawal or substantial impairment of a potentially-meritorious defense.

42. *The affidavits attached to Petitioner's petition do not establish that Petitioner was unable to run at the time of the offenses.*

43. In light of the fact that Petitioner's registered gun and a Chicago Bulls cap identical to Petitioner's were found in Unit B118, *if trial counsel had adduced evidence at trial that Petitioner's [MS] prevented him from running, the jury could reasonably have viewed that to be consistent with the evidence that the assailant fell while being chased* in the Maui Sunset parking lot *and that loud panting was then heard outside the bedroom* windows of [Behnken] and [Enns], directly across the Maui Sunset.

44. *The jury could also have deemed Petitioner's defense of being unable to run due to [MS] to be inconsistent with* objec-

tive evidence of the range of *various physical and athletic activities that Petitioner engaged in* prior to the offense.

45. From the record, and in light of [Respondent's] evidence as a whole bearing upon Petitioner's guilt, Petitioner's trial counsel's decision not to call [Krau] to testify that he told ... Petitioner to make notes of his activities surrounding the time of the offense was not an error or omission reflecting a lack of skill, judgment, or diligence, nor did it result in the withdrawal or substantial impairment of a potentially-meritorious defense, *since the jury could nonetheless have inferred from all of the evidence that Petitioner's handwritten notes were more consistent with having been manufactured* to avoid penal liability rather than having been a documentation of actual events.

46. In addition, Krau's testimony might have impaired Petitioner's defense by focusing more attention on Petitioners' notes, which stated that Detective Kaya told Petitioner about a crime involving a lady and her two sons, a fact which Detective Kaya denied.

47. Petitioner's trial counsel's decision not to call Petitioner as a witness was not an error or omission reflecting a lack of skill, care, and diligence, and it did not result in the withdrawal or substantial impairment of a potentially-meritorious defense.

48. It appears from the record involving Petitioner's Tachibana colloquy by the [c]ourt on April 13, 1998, that *Petitioner knew it was his decision to testify or not to testify, and that the [c]ourt told Petitioner that the decision [was] not that of Petitioner's counsel.*

49. Even if, as Petitioner claims, his counsel repeatedly told him not to testify at trial, that is not an error or omission.

50. It is one of defense counsel's responsibilities at trial to advise his client whether or not [to] testify.

51. In light of the record respecting Petitioner's April 13, 1998 colloquy with the [c]ourt on his right to testify, Petitioner's waiver of his constitutional right to testify in his own defense was both knowing and voluntary.

52. In light of the substantial evidence implicating Petitioner at trial, Petitioner has not shown how trial counsel's decision not to put on a defense case-in-chief was an error or omission reflecting a lack of skill, judgment, or diligence, and that the decision resulted in the withdrawal or substantial impairment of a potentially-meritorious defense.

(Emphases added.)

## VII.

Petitioner asserts that as to the first "reason" in his application, the court's application of the relevant standard was incorrect.

Instead of ... requiring that [Petitioner] establish the "possible impairment, rather than the probable impairment, of a potentially meritorious defense," *Wakisaka, supra,* the [court] effectively utilized a standard akin to the more stringent federal standard rejected by the Hawai'i Supreme Court in *Briones v. State,* 74 Haw. 442, 462 n. 12, 848 P.2d 966, 976–77 n. 12 (1993), which would require [Petitioner] to prove that it was *probable* (versus possible) that trial counsel's errors affected the results of the proceedings.

(Emphasis in original.) Applying this first "reason" in connection with the second "reason," Petitioner challenges several findings that are discussed herein, in seriatim.

## A.

As to finding 9, Petitioner maintains that "[t]his ... wholly omitted the fact that the witnesses had also provided estimates of the height, weight and hair color of the perpetrator that were markedly inconsistent with [Petitioner's] actual physical appearance." In its answering brief, Respondent argues that

there was substantial evidence in the record to support the finding ...:

1) [Mary] testified that the man wore dark colored clothing, dark gloves, and a dark ratty looking ski mask.

2) [Jeff] testified that the attacker was a "fairly good sized man in a ski mask

holding a knife all dressed in black[,]" wearing long sleeves and gloves.

3) [Jon] testified that the attacker was "all dressed in dark clothing[,]" with "long sleeves and something that covered his whole upper torso[,]" gloves, and a ski mask.

4) [Hoerner] testified that the attacker wore a black ski mask, black gloves, black pants, and camouflage long-sleeved shirt.

On review of the transcripts, the testimony as stated above is correct, and indicates that there was substantial evidence to support the finding. As Petitioner maintains, however, the finding omits evidence of the inconsistency in the descriptions of the perpetrator as compared to Petitioner's actual person. But so far as the finding goes, it was not clearly erroneous.

## B.

As to finding 22, Petitioner argues that "the court's recollection of Brown's testimony as stating that [Petitioner] went to Japan to study martial arts was simply incorrect. In fact, Brown testified that [Petitioner] had stated that he was going to Japan to teach English and that she had only *assumed* that he wanted to also study [k]arate." But in its answering brief, Respondent states that

Brown testified that she believed that[ ] [Petitioner's] reasons for the loan was because "he wanted to go to San Francisco and take English as a second language so he could teach in Japan"; and that [Petitioner] wanted to go to Japan "[b]ecause of his interest in karate." *The fact that it was merely an "assumption" by Brown does not make this [finding] clearly erroneous, since the finding correctly states Brown's testimony regarding her belief as to why [Petitioner] requested the loan.*

(Emphasis added.) According to the relevant transcript, the following was asked of Brown:

Q. And why did he want to go to Japan?

A. I believe because of his interest in [k]arate.

Q. And what did you know of his interest in [k]arate?

A. It was a matter of conversation in the group, he had a friend with him who had taught him karate I suppose.

The responses garnered from Brown tend to support Petitioner's position that the interest in karate came from Brown's supposition and not from Petitioner's stated intent. Thus the finding was partially erroneous, insofar as it definitively indicated Petitioner was going to Japan to study martial arts.

## VIII.

### A.

The following findings require extended discussion.

As to finding 42, Petitioner contends that it erroneously states that the "evidence did not establish ... he was unable to run at the time of the offense":

*[S]everal documents presented by [Petitioner] presented medical diagnoses and testimony that [Petitioner] could not run in the manner attributed to the perpetrator[,] ... includ[ing] a physician's report that ... [Petitioner] "showed that the left leg exhibited an upper motor neuron pattern of weakness," and that he had a "tendency to fall to the left on tandem walking and to have somewhat poor ankle dorsiflexion on heel walking."*

(Emphasis added.) In response, in its answering brief, Respondent contends that

the "Consultation Record" from the Department of Public Safety is inconclusive. The "evaluation" was apparently done on February 10, 2000[,] ... over three years *after* the January 27, 1997 ... attack on the Paulsens. In addition, the document states ...:

The patient has no active neurologic complaints except ... occasional increase in stiffness, primarily in the lower extremities on the left.

(Emphasis in original.) Further, Respondent argued:

Neither [Petitioner's nor Krau's] affidavit demonstrate[ ] that [Petitioner] was physically incapable of running at the time of

the offenses.... [Petitioner's] own affidavit establishes that [Petitioner] could run, albeit at a slow jog.

[T]he affidavit of Ira Chang, M.D., merely says ... he reviewed [Petitioner's] *medical records from 1989* which indicated [Petitioner] had some left-sided clumsiness, weakness and alleged difficulty walking, and that [Petitioner] had been diagnosed with [MS, but t]here is no opinion or conclusion that [Petitioner] would have been physically unable to run at all *at the time of the offenses.*

(Emphases in original.)

### B.

### 1.

As to findings 41 and 43, Petitioner apparently argues that it is a "recitation of the correct standard, [but] the [court's] application of the standard was erroneous" because "none of [Respondent's] witnesses could directly identify [Petitioner] as the perpetrator[,]" "the physical descriptions provided by the witnesses differed significantly from [Petitioner's] actual physical appearance[,]" and "the only other evidence ... was ... that a cap similar to one worn by [Petitioner] contain[ed] DNA that was 'potentially' his and a gun ... was registered to him (both of which [Petitioner] would have explained had been stolen from his apartment)."

### 2.

With respect to finding 43, Petitioner repeats that "the [court] had taken it upon itself to go beyond evaluating the *possible* effects of the omitted evidence and instead based its decision on its speculation as to what would have been the *probable* effects of the evidence on the jury's decision-making[.]" (Emphases in original.)

Similarly, as to finding 44, Petitioner contends "[i]ts supposition ... of what the jury 'could' have done ... indicates that the [court] had usurped the role of the jury at trial, instead of assuming its ... role as a court ruling on a motion alleging ineffective assistance[.]"

### C.

Petitioner's application did not present any argument as to the "notes" referred to in finding 45,[9] except to state that the court should not have decided that the jury could have disregarded the notes as manufactured, but "should have strictly limited itself ... to the possibility that ... [Petitioner's] MS impaired his ability to run." The "notes" aspect of finding 45 thus is not discussed further.

### D.

In its answering brief, Respondent responds with respect to the foregoing findings 41, 42, and 44, that (1) "none of [Respondent's] witnesses could *directly* identify [Petitioner] as the perpetrator. Recognizing this, [Sereno] apparently decided, as a matter of sound trial strategy, not to put forth any evidence[,] ... [but] simply to argue 'reasonable doubt' "; (2) "according to the 'undated redacted' pretrial letter to [Sereno], [Petitioner] apparently informed [Sereno] of his physical disability and the effect it had on his alleged inability to run[,]" and "[Petition-

---

9. With respect to finding 45, Respondent asserts (1) "any such testimony by Krau would have emphasized the falsehoods contained in the notes relating to statements allegedly made by the police to [Petitioner]" because "according to the notes, [Petitioner] knew that the crime involved a lady and her two sons[, h]owever, Detective Kaya never disclosed any of those facts as the handwritten notes claimed[,]" (2) "if Krau testified that he advised [Petitioner] to make notes of his activities in order to 'facilitate the police investigation[,]' " this "would have further exacerbated [Petitioner's] credibility problems because [Petitioner] never offered those notes or the information contained therein to the police to 'assist' ... their investigation[,]" inasmuch as "the notes were recovered through the execution of a search warrant of the backpack [Petitioner] wore at the time of his arrest[,] ... days after police initially contacted [Petitioner,]" (3) "since the nine handwritten notes contained material which alleged improper police tactics, Krau's proposed testimony that the notes were created 'to help the police during their investigation' and 'to facilitate the police investigation' would have been laughable," (4) "Krau's testimony would have ... emphasized that there were corrections to [Petitioner's] handwritten [notes] which were more consistent with having been manufactured rather than having been a documented actual event[ ]."

er] stated, '[I]f the trial is going well and you don't want me to testify could that be a possibility?'" and "[b]ased on this statement, it is clear that [Sereno] advised [Petitioner] to evaluate the strength of [Respondent's] case-in-chief before deciding whether or not to testify"; (3)(a) "evidence that [Petitioner's MS] restricted or prevented him from running would only have strengthened and/or corroborated [Respondent's] case against [Petitioner]" because "[s]ecurity guard Hoerner testified that the assailant fell, 'rolled' into a sitting position—not unlike a martial arts move—and then ran across the street into a small housing area[,]" (b) "Behnken and Enns testified to being awakened by the sound of a man, loudly panting and out of breath, . . . consistent with a person with a physical disability such as [MS]"; and (4) "evidence that [Petitioner] was unable to run . . . would . . . contradict the . . . undisputed evidence" "that [Petitioner]: [ (a) ] regularly rode a bicycle; [ (b) ] was an avid scuba diver; [ (c) ] was an admitted pig hunter; [ (d) ] was trained in the martial arts; and [ (e) ] worked out at the gym."

### IX.

In his application, Petitioner does not specifically pinpoint any conclusion for challenge but maintains generally that the "[conclusions] . . . upon which [the court's] ruling was based were in error."

### A.

■ Conclusion 1, that

Petitioner has the burden of establishing ineffective assistance of counsel, and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. *State v. Smith*, 63[68] Haw. 304, 309, 712 P.2d 496, 500 (1986); *State v. Morishige*, 65 Haw. 354, 369, 652 P.2d 1119, 1130 (1982); *State v. Antone*, 62 Haw. 346, 348–49, 615 P.2d 101, 104 (1980)[,]

is not entirely right. Conclusion 1 contains only a portion of the applicable standard. As discussed *infra*, this court has elaborated on the second prong of this test, explaining that a determination of "whether a defense is 'potentially meritorious' requires an evaluation of the *possible, rather than the probable, effect of the defense on the decision maker.*" *Briones*, 74 Haw. at 464, 848 P.2d 966, 977 (emphasis added) (footnote omitted).

### B.

Conclusion 2, in part states that "[s]pecific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny." (Citing *Briones*, 74 Haw. at 462–63, 848 P.2d at 976. (Citation omitted.)). In arriving at the decision that "it was tactically advantageous for Petitioner's trial counsel not to assert Petitioner's [MS] as a defense," the court stated:

> The affidavits that Petitioner submitted . . . do not establish that Petitioner could not run at the time of the offense. *Moreover, there was substantial evidence of record in the trial that Petitioner was capable of a range of physical and athletic activity.* Alternately, the assailant's falling while being pursued and the loud panting heard by Behnken and Enns outside their windows were not inconsistent with someone with a physical disability.

(Emphasis added.) Accordingly, also as set forth in conclusion 2 regarding "trial counsel's decision not to adduce evidence that Petitioner was unable to run due to [MS,]" the court declared "Petitioner has not met his burden" of showing "ineffective assistance of counsel[,]" apparently based on an evaluation of Respondent's evidence against Petitioner as "substantial."

### C.

With respect to Petitioner's failure to testify, the court ruled in conclusion 3 that "Petitioner told the [court] that he knew it was his decision, not that of his counsel, whether or not to testify, and then Petitioner did not testify." Relatedly, in conclusion 4, the court ruled that Petitioner had not demonstrated how Sereno's advice that Petitioner not testi-

fy on his own behalf amounted to ineffective assistance of counsel because "[i]t is one of defense counsel's responsibilities ... to advise the defendant on the question of whether or not he or she should testify." (Internal quotation marks, citations, and brackets omitted) (ellipses in original.)

### D.

In conclusion 5, the court stated that Petitioner had not met his "burden of establishing that" the decision not to put on a defense case-in-chief "reflected a lack of skill, judgment, or diligence[ ] ... that resulted in the withdrawal or substantial impairment of a potentially-meritorious [sic] defense." Thus, the court concluded that Petitioner was not entitled to relief under HRPP Rule 40 on this basis.[10]

### X.

 We observe that the correct standard to apply in a HRPP Rule 40 proceeding, as noted by Petitioner in his opening brief, is that

> *[i]n any claim of ineffective assistance of trial counsel, the burden is upon the defendant to demonstrate that, in light of all the circumstances, counsel's performance was not objectively reasonable—i.e., "within the range of competence demanded of attorneys in criminal cases."* In *[Antone]*, we set forth a two-part test requiring defendant to show *"specific errors or omissions ... reflecting counsel's lack of skill, judgment or diligence[,]" and that "these errors or omissions resulted in either the withdrawal or substantial impairment of potentially meritorious defense."*
>
> *Briones[ ],* 74 Haw. [at] 462, 848 P.2d [at] 976 ... (internal citations omitted) [ (ellipses and brackets in original) ]. . . .
>
> *Determining whether a defense is "potentially meritorious" requires an evaluation of the possible, rather than the probable, effect of the defense on the decision maker.* Appellate courts defer to the judge or jury as fact finder unless

no substantial evidence existed for their finding because the fact finder is uniquely qualified to evaluate the credibility of witnesses and to weigh the evidence. *Accordingly, no showing of "actual" prejudice is required to prove ineffective assistance of counsel.*

> *[Id.]* at 464, 848 P.2d at 977 (footnote and citations omitted).

(Emphases added.) As *Briones* indicated, the court, in determining a "potentially meritorious" defense, evaluates "the possible" (as opposed to probable) "effect ... on the decision maker," at least with respect to whether "a defense is potentially meritorious." 74 Haw. at 464, 848 P.2d at 977. Again, Petitioner maintains that, in applying the standard, the court rather than "evaluating the *possible* effects of the omitted evidence ...," instead engaged in a prediction of the credibility, weight, and effect that the evidence would have *probably* had on the jury's verdict." (Emphases in original.)

It would appear that a court should not determine credibility or weight of the evidence in a HRPP Rule 40 proceeding. *See Briones,* 74 Haw. at 464, 848 P.2d at 977 ("Appellate courts defer to the judge or jury as fact finder unless no substantial evidence existed for their finding because the fact finder is uniquely qualified to evaluate the credibility of witnesses and to weigh the evidence." (Footnote and citations omitted.)); *Aplaca,* 74 Haw. at 72, 837 P.2d at 1308 (stating that "we, as an appellate court, cannot predict the exact effect these prospective witnesses would have had on the trial court's assessment of [the complainant's] and [the defendant's] credibility").

Based on the record at present, evidence at trial, as stated in findings 43 and 44 regarding identity, must be counterpoised with evidence attached to Petitioner's Rule 40 petition: (1) "the 'Consultation Record' from the Department of Public Safety dated February 11, 2000, states that due to his MS, [Petitioner] had 'episodes of weakness in the lower extremities and diplopia[,]' " (2) Petitioner's "affidavit states that he has 'perma-

---

10. Conclusions 6, 7, and 8 concern Petitioner's claims that his appellate counsel was ineffective.

None of Petitioner's arguments pertain to these conclusions.

nent damage to the motor movement skills of [his] left leg, and [his] left leg is incapacitated as a result of [his] having [MS] for many years[,]'" (3) "the affidavit of [Krau] states that [Petitioner], when walking, 'has a distinct gait which cause[s] him to limp due to weakness in the left side of his body . . . [and w]hen jogging it is almost impossible for him to do so for any distance[,]'" (4) "the affidavit of Ira Chang, M.D., states that, '[e]xamination showed that the left leg exhibited an upper motor neuron pattern of weakness,' and that [Petitioner] 'had a tendency to fall to the left on tandem walking and to have somewhat poor ankle dorsiflexion on heel walking.'"

Hence finding 42 (stating the affidavits do not establish that Petitioner was unable to run) arguably engages in a weighing of the evidence, inasmuch as the import of the affidavits was whether Petitioner could run as *the perpetrator had.* The weight to be given the evidence in the affidavits, if presented at trial, would be one for the jury, and not for a judge at the HRPP Rule 40 stage. The omission of such evidence may possibly impair the defense of mistaken identification. *See Wakisaka,* 102 Hawai'i at 516, 78 P.3d at 329 (citation omitted).

Likewise, in deciding in finding 43 that the "jury could reasonably view" evidence of Petitioner's MS as "consistent" with the assailant falling and panting loudly involves a weighing of the evidence and is akin to a review for substantial evidence, not for the evaluation of whether the omitted evidence possibly impaired a potentially meritorious defense.

Also, finding 44, that "the jury could also have deemed" MS limitations "to be inconsistent" with evidence of Petitioner's physical activities, again involves a weighing of evidence in the manner in which the substantial evidence rule would be applied, rather than whether the failure to adduce such evidence would have possibly impaired a meritorious defense (here, obviously, the requirement that identification must be established beyond a reasonable doubt). *See id.*

Petitioner points out in his opening brief that, in *Aplaca,* this court said:

Although *we, as an appellate court, cannot predict the exact effect these prospective witnesses would have had on the trial court's assessment of [the complainant's] and [the defendant's] credibility,* we firmly believe that such testimony *could have had a direct bearing on the ultimate outcome of the case.* We therefore disagree with the ICA's conclusion that the unproffered testimony would not have cast any light on the sole defense in this case, that is, the lack of criminal intent. *The materials and affidavits are manifestly adverse to the ICA's finding.*

74 Haw. at 73, 837 P.2d at 1308 (emphases added). It would appear that evidence regarding restrictions on Petitioner's ability to run, as attached to his HRPP Rule 40 petition, "could have had a direct bearing on the ultimate outcome of the case," *id.,* because it bore on whether Petitioner could run in the same manner as the perpetrator had and, thus, on whether Respondent had proven beyond a reasonable doubt the identity of the perpetrator.

## XI.

Respondent's response in its answering brief was to cite the "obvious tactical basis" exception to the impairment rule:

Specific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny. If, however, the action or omission had no obvious basis for benefitting the defendant's case and it resulted in the withdrawal or substantial impairment of a potentially meritorious defense, then it will be evaluated as information that an ordinary competent criminal attorney should have had.

*State v. De Guair,* 108 Hawai'i 179, 187, 118 P.3d 662, 670 (2005) (some emphases in original and emphasis added) (internal quotation marks, brackets, ellipses, and citation omitted). In this regard the ICA noted that "[t]he [court] denied [Petitioner's] claims against . . . Sereno, stating[,]" as noted before, that "there may have been very good reasons why certain matters were not brought before the jury, particularly with

regard to the underlying disease which [Petitioner] was claiming had a significant effect on his ability to move." SDO at 7. Respondent argues that because the perpetrator wore a ski mask and there were discrepancies among the witnesses as to the description of the perpetrator, as Petitioner points out, a seemingly obvious tactical basis would be to "argue 'reasonable doubt'" regarding Respondent's case.

## XII.

First, as to Petitioner's own request to testify (findings 47–51), the ICA observed that the court said:

[O]n the Tachibana colloquy ... it's quite clear there was an adequate colloquy.

So *if* ... [Petitioner] wanted to indicate to the [c]ourt ... it was his decision and not his attorney's that he wanted to testify, he certainly could have indicated....

SDO at 7 (emphasis added). Relatedly, in *Jones v. State,* 79 Hawai'i 330, 331, 902 P.2d 965, 966 (1995), the defendant argued on appeal from the circuit court's denial of his HRPP Rule 40 petition that "the circuit court erred in concluding that his trial counsel had provided effective assistance of counsel with respect to [the defendant's] failure to testify in his own defense." At the HRPP Rule 40 hearing, the defendant "testified that his trial attorney had not told him that the decision to testify was his decision to make or that he could change his mind about testifying even after signing the written waiver." *Id.* at 333, 902 P.2d at 968.

On the other hand, the defendant's trial attorney "testified that he did not recall ever discussing [the defendant's] decision not to testify after the written waiver had been signed, but was sure that he had stressed to [the defendant] that the decision whether not to testify was his decision to make." *Id.* After conducting the hearing, the circuit court found that "the [d]efendant was properly advised of his right to testify and of his subsequent waiver, and that he knew of that right and knowingly and intelligently waive[d] that right." *Id.* at 333–34, 902 P.2d at 968–69.

The *Jones* court recognized that under *Tachibana,* "'in order to protect the right to testify under the Hawai'i Constitution, trial courts must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify." *Id.* at 333, 902 P.2d 965, 902 P.2d at 968 (quoting *Tachibana,* 79 Hawai'i at 236, 900 P.2d at 1303 (footnotes omitted)).

But 'the *Jones* court concluded, "based on [its] review of the record, [and] particularly the testimony presented by [the defendant's] trial counsel, ... that the circuit court's findings that [the defendant] was properly advised of his right to testify and that he knowingly and intelligently waived that right were not clearly erroneous." *Id.* at 334, 902 P.2d at 969. Accordingly, this court held that "to the extent that [the defendant's HRPP Rule 40] petition was based on an alleged violation of his right to testify, ... the circuit court did not err in denying the petition." *Id.* Thus, on similar facts, Petitioner cannot claim ineffective assistance of counsel as to his not testifying at trial.

## XIII.

As to evidence other than Petitioner's own testimony, Respondent argued, as indicated *supra,* that there were "obvious tactical bas[e]s" for not producing such evidence. Respondent contended that the omitted evidence (1) would have "strengthened and/or corroborated the [Respondent's] case" because of evidence that the assailant fell, rolled into a sitting position, and apparently exhibited "loud panting and heavy breathing," and (2) would have "contradict[ed] ... evidence of [Petitioner's] physical activities."

However, it is questionable that there was an "obvious tactical basis" for suppressing countervailing evidence as presented in the Consultation report, Dr. Chang's affidavit, and Krau's affidavit, *see supra,* which would contradict or mitigate the effect of Respondent's evidence. Such evidence, at the least, presented a colorable claim of ineffective assistance of counsel. *Hutch v. State,* 107 Hawai'i 411, 414, 114 P.3d 917, 920 (2005) (noting that "a hearing should be held on a Rule 40 petition for post-conviction relief where the petition states a colorable claim[,]" and

that "[t]o establish a colorable claim, the allegations of the petition must show that if taken as true the facts alleged would change the verdict" (quoting *Dan v. State,* 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994) (quoting *State v. Allen,* 7 Haw.App. 89, 92–93, 744 P.2d 789, 792–93 (1987)))) .(emphasis omitted).

Apparently the jury was not informed of the fact that Petitioner had MS and that there was evidence contradicting whether Petitioner could run the distance involved or in the manner described while being chased. Rather than "strengthen[ing] or corroborat[ing]" Respondent's case, such evidence could cast doubt on its identity evidence. As to "contradicting" evidence of Petitioner's physical activities, such information would seemingly qualify such activities. Thus, according to Petitioner, the ICA gravely erred because in this context "trial counsel's failure to present evidence that would have further excluded [Petitioner] as the perpetrator (i.e. evidence that would have shown that he could not have run as the perpetrator did ...) would have at least possibly affected the jury's verdict" and "did in fact result in the 'possible impairment, rather than a probable impairment, of a potentially meritorious defense.'" (Quoting *Wakisaka,* 102 Hawai'i at 514, 78 P.3d at 327.) (Citation omitted.)

## XIV.

### A.

As stated previously, HRPP Rule 40(a)(1) entitles Petitioners to relief from judgment if there is "any ground which is a basis for collateral attack on the judgment." HRPP Rule 40(c)(1) requires petitioners to set forth in their petitions

> all the grounds for relief which are available to the petitioner and of which the petitioner has or by the exercise of reasonable diligence should have knowledge and shall set forth in summary form the facts supporting each of the grounds thus specified. It shall also state the relief requested.

HRPP Rule 40(f) dictates that "[i]f a petition alleges facts that if proven would entitle the

petitioner to relief, the court shall grant a hearing...."

As an exception to this general rule, HRPP Rule 40(f) further provides that "the court may deny a[n evidentiary] hearing if the petitioner's claim is *patently frivolous* ...." (Emphasis added.) Despite its statement regarding "get[ting] to a point ... of a colorable claim," the court did not find or conclude that Petitioner's claim was "patently frivolous." Rather, it entered numerous findings concerning the evidence at trial and concluded that that trial counsel's "decision not to call [Krau] or produce other evidence in a defense case-in-chief does not constitute ineffective assistance of counsel and does not support relief pursuant to Rule 40[.]"

Thus, the court apparently found that Petitioner's Rule 40 petition raised at least a colorable claim of ineffective assistance of counsel inasmuch as (1) it did not rule that the petition was "patently frivolous" and (2) it resolved the merits of the arguments raised in the petition. Furthermore, we note that on their faces, the affidavits present a colorable claim of ineffective assistance of counsel because if the facts therein were taken as true, they could change the verdict. *See Barnett v. State,* 91 Hawai'i 20, 26, 979 P.2d 1046, 1052 (1999) (noting that a petition raises a colorable claim if the allegations therein, "if taken as true[,]" "would change the verdict" (citation omitted)). Specifically, Petitioner could have been able to establish that he could not run in the same manner as the perpetrator, coupled with the inability of Respondent's witnesses to unequivocally identify Petitioner as the perpetrator.

### B.

If a Rule 40 petition raises a colorable claim of ineffective assistance of counsel, the court must hold an evidentiary hearing. HRPP Rule 40(f) ("If a petition alleges facts, that if proven would entitle the petitioner to relief, the court shall grant a hearing which may extend only to the issues raised in the petition or answer.") Accordingly, a full and fair evidentiary hearing is required on Petitioner's claims. *Hutch,* 107 Hawai'i at 414, 114 P.3d at 920 (holding that "a hearing on a Rule 40 petition is required whenever the

allegations in a petition, if taken as true, (1) would change the verdict rendered or (2) would establish the illegality of custody following a judgment[ ]" (citing HRPP Rules 40(a) and (f)); *Turner*, 93 Hawai'i at 310, 1 P.3d at 780))); *see also* HRPP Rule 40(f) ("The petitioner shall have a full and fair evidentiary hearing on the petition. The court shall receive all evidence that is relevant and necessary to determine the petition . . . ."). The evidentiary hearing should also include an opportunity for Sereno to explain his trial strategy. *See id.* ("Where the petition alleges ineffective assistance of counsel as a ground upon which the requested relief should be granted, the petitioner shall serve written notice of the hearing upon the counsel whose assistance is alleged to have been ineffective and said counsel shall have an opportunity to be heard."); *see also State v. Moses*, 107 Hawai'i 282, 293, 112 P.3d 768, 779 (App.2005) (noting that "counsel should [be] given every opportunity to explain the reasons for" the challenged conduct (citing *Matsuo v. State*, 70 Haw. 573, 578, 778 P.2d 332, 335 (1989)); *State v. Smith*, 106 Hawai'i 365, 378, 105 P.3d 242, 255 (App. 2004) (stating that the decision not to call witnesses is "normally a matter within the judgment of counsel and will rarely be second-guessed" by the courts (citing *State v. Richie*, 88 Hawai'i 19, 39, 40, 960 P.2d 1227, 1248 (1998)))).

The court acted conscientiously in the disposition of Petitioner's Rule 40 petition. However, in light of the issues raised on certiorari, a full and fair evidentiary hearing on Petitioner's claims related to his MS evidence, other than Petitioner's own trial testimony, must be held. Therefore, the ICA's April 12, 2007 judgment and the court's December 1, 2004 Findings of Fact, Conclusions of Law, and Order Denying Petition to Vacate, Set Aside, or Correct Judgment or to Release Petitioner From Custody are vacated, and Petitioner's HRPP Rule 40 petition is remanded for such a hearing.